Robert Mackey (SBN 125961)
bobmackeyesq@aol.com
**LAW OFFICES OF ROBERT MACKEY**
660 Baker Street
Building A, Ste. 201
Costa Mesa, CA 92626
Tel: (412) 370-9110

*Attorneys for Plaintiff and Proposed Class*

## UNITED STATES DISTRICT COURT FOR THE
## CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| HEATHER HOLDING, individually and on behalf of all others similarly situated | ) ) ) |
| *Plaintiff,* | ) **Case No.** |
| v. | ) ) **CLASS ACTION COMPLAINT** |
| LA BUSINESS MANAGEMENT SERVICES, LLC d/b/a SKIN AND CANCER INSTITUTE, | ) ) **JURY TRIAL DEMANDED** ) |
| *Defendant.* | ) ) ) ) |

## CLASS ACTION COMPLAINT

Plaintiff Heather Holding ("Plaintiff"), individually and on behalf of all others similarly situated, by and through undersigned counsel, hereby alleges the following against Defendant LA Business Management Services, LLC d/b/a Skin and Cancer Institute ("Skin and Cancer Institute" or "Defendant"). Facts pertaining to Plaintiff and their personal experiences and circumstances are alleged based upon personal knowledge, and all other facts herein are alleged based upon the investigation of counsel and upon information and good faith belief.

## NATURE OF THE ACTION

1. This is a class action lawsuit for damages and injunctive relief arising from Defendant's unlawful practice of disclosing Plaintiff's and Class members' individually identifiable health

information ("IIHI") and protected health information ("PHI") (referred to herein collectively as "Private Information") to unauthorized third parties including, but not limited to, Google LLC ("Google"), and Ahrefs Pte. Ltd. ("Ahrefs") (collectively, the "Information Recipients").

2.     Defendant owns, controls, and maintains https://skinandcancerinstitute.com/ (referred to herein as the "Website"), a website which requires individuals to share highly sensitive Private Information in order to receive a variety of medical treatments.

3.     Defendant installed and implemented "pixels" and similar tracking technologies such as those made available by the Information Recipients (referred to herein as the "Tracking Technologies") on the Website.

4.     Invisible to the naked eye, each of the Tracking Technologies collects and transmits information from the user's browser to the corresponding Information Recipient as the user enters information into the Website. Installed by Defendant, the Tracking Technologies secretly enable the unauthorized transmission and disclosure of Plaintiff's and Class members' Private Information to the Information Recipients.

5.     Through the use of Tracking Technologies, Defendant's Website directs Plaintiff's and Class members' communications, including Private Information, to automatically be sent to the servers of the corresponding Information Recipients. This occurs on every web page on which Defendant installed the Tracking Technologies.

6.     Thus, operating as implemented by Defendant, the Tracking Technologies disclose the Private Information that Plaintiff and Class members submit via the Website in confidence to the Information Recipients. Simultaneously, the Tracking Technologies disclose unique account identifiers linked to the user's account with that Information Recipient (or otherwise linked to an online a unique tracking identifier maintained by that Information Recipient associated with that user). With this information, the Information Recipients link the Private Information with the user's real life identity.

7.     Defendant chose to implement systematic tracking across the Website, meaning that their Users' identities and information intimately tied to their healthcare, such as searches for specific conditions, booking information, and clinic location preferences—which is Private Information—is

communicated to the Information Recipients as a user interacts with the Website. That this information is tied to the individual's personal medical care is indisputable due to the systematic nature of the tracking implemented by Defendant. A User is tracked each step of the way, from landing on the homepage to researching conditions and providers to researching treatment locations, to booking a specific treatment for that condition. There can be no doubt that this information is related to the individual's personal healthcare needs.

8. To take an example, Google's Tracking Technologies send tremendous amounts of data to Google, unbeknownst to the user. As one District Court recently described:

> Whenever a user visits a website that is running Google Analytics, Ad Manager, or some similar Google service, Google's software directs the user's browser to send a separate communication to Google. This happens even when users are in private browsing mode, unbeknownst to website developers or the users themselves. The operation is not in dispute. When a user visits a website, the user's browser sends a "GET" request to the website to retrieve it. This GET request contains the following information: the Request URL, or the URL of the specific webpage the user is trying to access; the user's IP address; the User-agent, which identifies the user's device platform and browser; user's geolocation, if available; the Referer, which is the URL of the page on which the user clicked a link to access a new page; event data, which describes how users interact with a website, for example, whether they saw an ad or played a video; and the actual search queries on the site. At the same time, the user's browser reads Google's code, which is embedded on the website. Google's code instructs the user's browser to send a second and concurrent transmission directly to Google. This second transmission tells Google exactly what a user's browser communicated to the website.[1]

9. While Defendant willfully and intentionally incorporated the Tracking Technologies into the Website, Defendant failed to affirmatively disclose to Plaintiff or Class members that they shared the Private Information generated by their interactions with the Website with third parties.

10. Health care patients simply do not anticipate that their trusted health care provider will send Private Information collected via its website to undisclosed third parties. By employing third-party trackers, Defendant effectively bartered the private medical information of its patients for more detailed analytics of its users to increase its revenues and profits.

11. Despite numerous warnings from federal regulators (and several Federal Trade Commission enforcement actions against health care companies with an online presence for similar

---

[1] *Brown v. Google LLC*, 685 F. Supp. 3d 909, 919-20 (N.D. Cal. 2023) (internal citations omitted).

conduct) about the data privacy risks of using third-party tracking technologies,[2] Defendant designed and maintained its Website so that users would be required to submit Private Information in order to schedule consultations and schedule appointments to receive treatment. In doing so, Defendant violated numerous federal and state laws and breached numerous common law duties to its customers.

12.     Defendant owed common law, contractual, statutory, and regulatory duties to keep Plaintiff's and Class members' Private Information safe, secure, and confidential. Furthermore, by obtaining, collecting, using, and deriving a benefit from Plaintiff's and Class members' Private Information, Defendant assumed legal and equitable duties to patients to protect and safeguard their Private Information from unauthorized disclosure.

13.     Defendant, however, failed in its obligations and promises by utilizing the Tracking Technologies on the Website as described herein, knowing that such technology would transmit and share Plaintiff's and Class members' Private Information with the Information Recipients.

14.     Defendant breached its obligations to Plaintiff and the Class members in one or more of the following ways: (1) failing to adequately review their marketing programs and web-based technology to ensure the Website was safe and secure; (2) failing to remove or disengage technology that was known and designed to share patients' Private Information; (3) failing to obtain the consent of patients, including Plaintiff and Class members, to disclose their Private Information to the Information Recipients; (4) failing to take steps to block the transmission of Plaintiff's and Class members' Private Information through the Tracking Technologies; (5) failing to warn Plaintiff and Class members of such sharing and disclosures; and (6) otherwise failing to design and monitor the Website to maintain the confidentiality and integrity of patients' Private Information.

15.     Defendant intentionally chose to put their profits over the privacy of their users. The

---

[2] *See, e.g.*, Heather Landi, FIERCE HEALTHCARE, *Regulators Warn Hospitals and Telehealth Companies about privacy risks of Meta, Google Tracking Tech*, (July 21, 2023), https://www.fiercehealthcare.com/health-tech/regulators-warn-hospitals-and-telehealth-companies-about-privacy-risks-meta-google (noting that the Federal Trade Commission ("FTC") and the U.S. Department of Health and Human Services' Office for Civil Rights ("OCR") issued a rare joint release announcing that 130 hospital systems and telehealth providers received a letter warning them about the data privacy and security risks related to the use of online tracking technologies integrated into their websites or mobile apps).

unilateral disclosure of users' Private Information in this manner is unquestionably a violation of the Health Insurance Portability and Accountability Act of 1996 ("HIPAA"), among other statutory and common laws.

16.     The disclosure of Plaintiff's and Class members' Private Information via the Tracking Technologies contravenes the letter and spirit of HIPAA's "Standards for Privacy of Individually Identifiable Health Information" (also known as the "Privacy Rule"), which governs how health care providers must safeguard and protect Private Information.[3]

17.     The HIPAA Privacy Rule sets forth policies to protect all IIHI that is held or transmitted by a covered entity such as Defendant. There are eighteen HIPAA Identifiers that are considered personally identifiable information because this information can be used to identify, contact, or locate a specific person or can be used with other sources (such as a person's accounts with the Information recipients) to identify a single individual. When IIHI is used in conjunction with one's physical or mental health or condition, health care, and/or one's payment for that health care, it becomes PHI.[4]

18.     While health care entities regulated under HIPAA may use third-party tracking tools, they can do so only in a very limited way to perform analysis on data key operations.

19.     Simply put, further to the HIPAA Privacy Rule, covered entities such as Defendant are simply *not* permitted to use tracking technology tools (like the Tracking Technologies) in a way that exposes patients' Private Information to any third party without express and informed consent.

20.     Lest there be any doubt of the illegal nature of Defendant's practice, the Office for Civil Rights ("OCR") at the U.S. Department of Health and Human Services ("HHS") has made clear in a

---

[3] *The HIPAA Privacy Rule*, U.S. DEPARTMENT OF HEALTH AND HUMAN SERVICES, https://www.hhs.gov/hipaa/for-professionals/privacy/index.html (last visited Oct. 23, 2025).
[4] *Guidance regarding Methods for De-identification of Protected Health Information in Accordance with the Health Insurance Portability and Accountability Act (HIPAA) Privacy Rule*, U.S. DEPARTMENT OF HEALTH AND HUMAN SERVICES, https://www.hhs.gov/hipaa/for-professionals/privacy/special-topics/de-identification/index.html (last visited Oct. 23, 2025) (HIPAA identifiers include name; address (all geographic subdivisions smaller than state, including street address, city county, and zip code); all elements (except years) of dates related to an individual (including birthdate, admission date, discharge date, date of death, and exact age); telephone numbers; email address; medical record number; health plan beneficiary number; account number; device identifiers and serial numbers; web URL; Internet Protocol (IP) address; and any other characteristic that could uniquely identify the individual).

CLASS ACTION COMPLAINT

recent bulletin entitled *Use of Online Tracking Technologies by HIPAA Covered Entities and Business Associates* (the "HHS OCR Bulletin"), that the unlawful transmission of such protected information violates HIPAA's Privacy Rule:

> Regulated entities [to which HIPAA applies] are not permitted to use tracking technologies in a manner that would result in impermissible disclosures of PHI to tracking technology vendors or any other violations of the HIPAA Rules. ***For example, disclosures of PHI to tracking technology vendors for marketing purposes, without individuals' HIPAA-compliant authorizations, would constitute impermissible disclosures.***[5]

21.     Further reiterating the importance of and necessity for data security and privacy concerning health information, the Federal Trade Commission ("FTC") published a bulletin which is permanently live on New York University's ("NYU") Program on Corporate Compliance and Enforcement page entitled *Protecting the privacy of health information: A Baker's dozen takeaways from FTC cases*, in which it noted:

> Health information is not just about medications, procedures, and diagnoses. ***Rather, it is anything that conveys information—or enables an inference—about a consumer's health***. Indeed, [recent FTC enforcement actions involving] *Premom*, *BetterHelp*, *GoodRx* and *Flo Health* ***make clear that the fact that a consumer is using a particular health-related app or website—one related to mental health or fertility, for example—or how they interact with that app (say, turning***

---

[5] *Use of Online Tracking Technologies by HIPAA Covered Entities and Business Associates,* U.S. DEPARTMENT OF HEALTH AND HUMAN SERVICES, https://www.hhs.gov/hipaa/for-professionals/privacy/guidance/hipaa-online-tracking/index.html (emphasis added) (last visited Oct. 23, 2025). The Bulletin notes that "IIHI collected on a regulated entity's website or mobile app generally is PHI, even if the individual does not have an existing relationship with the regulated entity and even if the IIHI, such as in some circumstances IP address or geographic location, does not include specific treatment or billing information like dates and types of health care services." *Id.* This guidance was recently vacated in part due to the court finding it in part to be the product of improper rulemaking, and it is cited for reference only until OCR updates its guidance, should it do so in the future. See *American Hosp. Ass'n. v. Becerra*, 738 F. Supp. 3d 780 (N.D. Tex. 2024). The Court's Order found only that OCR's guidance regarding covered entities' collection and disclosure to third parties of users' IP addresses while they navigated unauthenticated public webpages ("UPWs") was improper rulemaking. The Order in no way affects or undermines OCR's guidance regarding covered entities disclosing unique personal identifiers, such as Google or Facebook identifiers, to third parties while patients make appointments for particular conditions, pay medical bills or log into (or use) a patient portal. *See Id.* at 789-90, 807, n. 8 (vacating OCR guidance with respect to the "Proscribed Combination" defined as "circumstances where an online technology connects (1) an individual's IP address with (2) a visit to a UPW addressing specific health conditions or healthcare providers" but stating that "[s]uch vacatur is not intended to, and should not be construed as, limiting the legal operability of other guidance in the germane HHS document.").

CLASS ACTION COMPLAINT

*'pregnancy mode' on or off) may itself be health information.*[6]

22.     The FTC is unequivocal in its stance as it informs—in no uncertain terms—health care companies that they should ***not*** use tracking technologies to collect sensitive health information and disclose it to various platforms without informed consent:

> **Don't use behind-the-scenes tracking technologies that contradict your privacy promises or otherwise harm consumers.**
>
> In today's surveillance economy, the consumer is often the product. Consumer data powers the advertising machine that goes right back to the consumer. ***But when companies use consumers' sensitive health data for marketing and advertising purposes, such as by sending that data to marketing firms via tracking Pixels on websites or software development kits on apps, watch out.***[7]

23.     Recent FTC enforcement actions such as *BetterHelp*, *GoodRx*, *Premom*, and *Flo* make clear that practices like that may run afoul of the FTC Act if they violate privacy promises or if the company fails to get consumers' affirmative express consent for the disclosure of sensitive health information.[8][9]

24.     Plaintiff brings this lawsuit on behalf of similarly situated individuals whose sensitive Private Information was intentionally, recklessly, and/or negligently disclosed to the Information Recipients through Defendant's unauthorized utilization of the Tracking Technologies.

25.     The Private Information that the Tracking Technologies gathered from Defendant's Website and sent to the Information Recipients included the Private Information that Plaintiff and Class members submitted to Defendant's Website, including for example, particular health conditions, types of health treatment sought and/or received, booking information and other confidential IIHI and

---

[6] *See* Elisa Jillison, *Protecting the privacy of health information: A Baker's dozen takeaways from FTC cases,* NYU COMPLIANCE AND ENFORCEMENT https://wp.nyu.edu/compliance_enforcement/2023/09/04/protecting-the-privacy-of-health-information-a-bakers-dozen-of-takeaways-from-ftc-cases/ (emphasis added) (last visited January 1, 2026).

[7] *Id.* (emphasis added).

[8] *Id.* (emphasis added) (further noting that *GoodRx* & *Premom* underscore that this conduct may also violate the Health Breach Notification Rule, which requires notification to consumers, the FTC and, in some cases, the media, of disclosures of health information without consumers' authorization).

[9] *In re Flo Health, Inc.*, File No. 192-3133, Decision & Order (F.T.C. June 22, 2021); *In re BetterHelp, Inc.*, File No. 202-3169, Decision & Order (F.T.C. July 14, 2023); *In re GoodRx Holdings, Inc.*, File No. 202-3090, Stipulated Order (F.T.C. Feb. 17, 2023); *In re Easy Healthcare Corp.*, File No. 202-3186, Stipulated Order (F.T.C. June 26, 2023).

CLASS ACTION COMPLAINT

PHI.

26. The Information Recipients in turn use Plaintiff and Class members' Private Information for business purposes, including using such information to improve advertisers' ability to target specific demographics and selling such information to third-party marketers who target Plaintiff and Class members online (*i.e.*, through their social media and personal accounts).

27. Plaintiff and Class members have suffered injury as a result of Defendant's conduct. These injuries include (1) invasion of privacy, (2) lost time and opportunity costs associated with attempting to mitigate the actual consequences of the transmissions of their Private Information to the Information Recipients, (3) loss of the benefit of the bargain, (4) diminution of value of the disclosed Private Information, (5) statutory damages, and (6) the continued and ongoing risk to their Private Information.

28. Plaintiff seek to remedy these harms and bring causes of action for: (1) negligence; (2) invasion of privacy; (3) breach of confidence; (4) unjust enrichment; (5) violations of the Electronics Communication Privacy Act ("ECPA"), 18 U.S.C. § 2511(1); (6) violations of the California Invasion of Privacy Act ("CIPA"); (7) violations of the California Confidentiality of Medical Information Act ("CMIA"); and (8) violations of the California Consumer Privacy Act ("CCPA").

## PARTIES

### A.    Plaintiff Heather Holding

29. Plaintiff Heather Holding is a citizen of the state of California residing in Arroyo Grande and brings this action in an individual capacity and on behalf of all others similarly situated. Plaintiff Holding is and has at all relevant times been a resident of California.

30. On numerous occasions beginning in early 2024, Plaintiff utilized Defendants' Website on her personal electronic devices including her phone and laptop computer to research treatments for skin cancer and book appointments for treatment related to the same. Plaintiff's most recent visit to Defendant's website was in 2024. In the process of using Defendant's services, Plaintiff disclosed highly sensitive IIHI and PHI to Defendants concerning her health conditions and research of skin cancer.

31.     While Plaintiff was a user of Defendants' services, she never consented to or authorized the use of her Private Information by third parties or to Defendants enabling third parties to access, interpret, and use such Private Information.

32.     Plaintiff had a Facebook, Instagram, Google, and TikTok account while she used Defendants' services, and she accessed Defendants' Website while logged into her accounts on the same device.

33.     After providing her Private Information to Defendant through the Website, Plaintiff immediately began seeing targeted health ads for related products and services.

34.     Plaintiff trusted that the Private Information that she provided to Defendant would be safeguarded according to Defendant's policies, industry standards, and state and federal law.

35.     Plaintiff first discovered that Defendant had collected and shared her Private Information without consent on or around September 16, 2025, after contacting undersigned counsel and discussing their potential claims against Defendant.

36.     Plaintiff was injured by Defendant's unauthorized disclosure of her confidential medical information. Defendant's actions subjected her to unsolicited targeted advertising related to the specific medical services she received and caused significant mental distress arising from the implication that advertisers were aware of her medical conditions and the fear that her friends, family, or colleagues might see these advertisements and thereby learn of her medical conditions. Additionally, Plaintiff lost the benefit of her bargain with Defendants. Plaintiff used Defendant's website to research treatments believing that Defendant would keep her Private Information confidential and would not have done so had she known of Defendant's actual practices. Finally, Defendants' practice of sharing Plaintiff's Private Information has diminished the value of the disclosed Private Information.

37.     Pursuant to the systematic process described in this Complaint, the Private Information that Plaintiffs entrusted to Defendants, was disclosed to the Pixel Information Recipients without Plaintiffs' knowledge or consent.

38.     Defendants transmitted and/or enabled the transmission of such Private Information without Plaintiff's knowledge, consent, or express written authorization. By failing to receive such

requisite consent, Defendant breached confidentiality and unlawfully disclosed each Plaintiff's Private Information.

39.     But for Plaintiff's status as users of Defendant's services and Defendant's express and implied promises regarding the security of their Private Information, Plaintiff would not have disclosed such information to Defendants.

**B.      Defendant**

40.     Defendant LA Business Management Services, LLC d/b/a Skin and Cancer Institute is a corporation formed in California and headquartered in Los Angeles, California, with approximately fifty locations across the United States. Defendant offers a variety of medical treatments, including medical dermatology, skin cancer treatments, and cosmetic surgery. Defendant claims that "[o]ur board-certified dermatologists are experienced in diagnosing and treating skin cancers using Mohs micrographic surgery as well as other treatments such as topical medications, radiation therapy, and cryotherapy."[10]

41.     On February 5, 2026, Plaintiff sent a letter to Defendant via certified mail notifying Defendant of their claims asserted herein and their intent to file suit. Defendant failed to respond.

## JURISDICTION & VENUE

42.     This Court has subject matter jurisdiction pursuant to the Class Action Fairness Act of 2005 ("CAFA"), 28 U.S.C. § 1332(d). The amount in controversy exceeds the sum of $5,000,000 exclusive of interest and costs, there are more than 100 putative class members, and minimal diversity exists because several of the Plaintiff and many putative class members are citizens of a different state than Defendant. This Court also has supplemental jurisdiction pursuant to 28 U.S.C. § 1367(a) because all claims alleged herein form part of the same case or controversy.

43.     This Court has personal jurisdiction over Defendant because it operates and maintains its principal place of business in this District. Further, Defendant is authorized to and regularly conducts business in this District and makes decisions regarding corporate governance and

---

[10] Early Detection and Expert Treatment, https://skinandcancerinstitute.com/skin-cancer/ (last visited March 13, 2026).

management of the Website in this District, including decisions regarding the privacy of patients' IIHI and PHI and the incorporation of the Tracking Technologies.

44. Venue is proper in this District under 28 U.S.C. § 1391(a) through (d) because: a substantial part of the events giving rise to this action occurred in this District, including decisions made by Defendant's governance and management personnel or inaction by those individuals that led to the unauthorized sharing of Plaintiff's and Class members' Private Information; Defendant's principal place of business is located in this District; Defendant collects and redistributes Class members' Private Information in this District; and Defendant caused harm to Class members residing in this District.

## FACTUAL ALLEGATIONS

45. Defendant has utilized the Tracking Technologies since at least 2024.

46. Defendant installed the Tracking Technologies on many (if not all) of the pages within the Website and programmed or permitted those pages to surreptitiously share patients' private and protected communications to Defendant with the Information Recipients—communications that included Plaintiff's and Class members' Private Information.

47. In order to understand Defendant's unlawful data-sharing practices, it is important to first understand some of the basic web design before delving into the Tracking Technologies at issue.

*A.      Communicating Over the Internet: HTTP Requests, HTTP Responses, and Cookies*

48. Web browsers are software applications that allow consumers to navigate the web and view and exchange electronic information and communications over the Internet.

49. Each "client-side" device (such as a computer, tablet, or smartphone) typically accesses web content through a web browser (e.g., Google's Chrome browser, Mozilla's Firefox browser, Apple's Safari browser, and Microsoft's Edge browser).

50. On the other side of the equation, every website is hosted by a computer "server" that holds the website's contents. The entity or entities in charge of the website exchange communications with users' client devices as the users' web browsers query the server through the Internet.

51. Web communications consist of Hypertext Transfer Protocol ("HTTP") or Hypertext

Transfer Protocol Secure ("HTTPS") requests and HTTP or HTTPS responses. Any given browsing session may consist of the transmission of thousands of individual HTTP requests and HTTP responses, along with corresponding "cookies." Important concepts here are detailed below:

a. **HTTP request**: an electronic communication sent from the client device to the website's server. GET Requests are one of the most common types of HTTP Requests. In addition to specifying a particular Universal Resource Locator ("URL") (i.e., web address), GET Requests can also send data to the host server embedded inside the URL and can include cookies. POST Requests can send a large amount of data outside of the URL (for instance, uploading a PDF to file a motion to a court).

b. **Cookies**: "small files of information that a web server generates and sends to a web browser. Web browsers store the cookies they receive for a predetermined period of time, or for the length of a user's session on a website. They attach the relevant cookies to any future requests the user makes of the web server. Cookies help inform websites about the user, enabling the websites to personalize the user experience. For example, ecommerce websites use cookies to know what merchandise users have placed in their shopping carts."[11] A stored cookie is sent with HTTP requests from client devices to the host server. Once received, a cookie typically remains on the client-side browser and is used by the server to associate website activity with a specific user. Some cookies are "third-party cookies," which means they can store and communicate data when visiting one website to an entirely different website.

c. **HTTP response**: an electronic communication that is sent as a reply to the client device's web browser from the host server in response to an HTTP request. HTTP responses may consist of a web page, another kind of file, text information, or error codes, among other data.

52. A user's HTTP request asks the server hosting a website to retrieve certain information, such as a set of health screening questions. The HTTP response sends the requested information in the

_____

[11] *See What are cookies? | Cookies definition*, CLOUDFLARE, https://www.cloudflare.com/learning/privacy/what-are-cookies/ (last visited Oct. 24, 2025).

CLASS ACTION COMPLAINT

form of "Markup." This is the foundation for the pages, images, words, buttons, and other features that appear on the user's screen as they navigate a website.

53.     Every website is comprised of Markup and "Source Code." Source Code is a simple set of instructions that commands the website user's browser to take certain actions when the web page first loads or when a specified event triggers the code. Source Code may also command a web browser to send data transmissions to third parties in the form of HTTP requests quietly executed in the background without notifying the web browser's user.

**B.    *The Tracking Technologies Share Users' Actions on the Website Along with Identifying Information***

54.     The Tracking Technologies are Source Code that surreptitiously transmits a Website user's communications and inputs to the corresponding Information Recipient much like a traditional wiretap. When individuals visit Defendant's Website via an HTTP request to Defendant's server, Defendant's server sends an HTTP response. This information is used by the user's web browser to display the web page that the user sees. The Source Code (including the Tracking Technologies) operates in the background on each page of the Website. whether the user has an account with Defendant or not.

55.     Thus, Defendant is, in essence, handing its patients a tapped phone. Once a page of the Website is loaded into the patient's browser, the Tracking Technologies are quietly waiting to intercept private communications on the web page intended only for Defendant and transmit those communications to the corresponding Information Recipient.

56.     Third parties like the Information Recipients place third-party cookies in the web browsers of users logged into their services. These cookies uniquely identify the user and are sent with each intercepted communication to ensure the third party can uniquely identify the user associated with the information intercepted (in this case, highly sensitive Private Information).

57.     Defendant intentionally configured Tracking Technologies installed on their Website to capture both the "characteristics" of individual patients' communications with the Defendant's Website (i.e., their IP addresses, unique account identifiers and related information, cookie identifiers, device identifiers, and account numbers) and the "content" of these communications (i.e., the buttons,

links, pages, and tabs they click and view).

58. One of the Tracking Technologies Plaintiff identified on the Website surreptitiously collects and transmits information to Google.

**C.   *Google's Tracking Technologies: Google Analytics, Google Ads, and Signals***

59. Google is one of the world's largest companies, with annual revenues approaching $100 billion a year.[12] Much of this revenue is derived from advertising across platforms, accounting for over 75% of the company's revenue.[13]

60. In conjunction with its advertising business, Google encourages and promotes entities and website owners, such as Defendant, to utilize various Tracking Technologies within the Google Analytics ecosystem to gather, identify, target, and market products and services to individuals.

61. Google Analytics allows businesses to send web events, such as clicks, form submissions, and other user actions performed by the user on the Website, from their own servers to Google and other third parties.[14]

62. Google Analytics accomplishes this through a piece of code that a website owner elects to embed in their website. When a user visits a page with the Google Analytics code installed, the user's browser executes the code and allows Google to collect voluminous information about that user and their interactions with the site.[15]

---

[12] *Alphabet Announces Fourth Quarter And Fiscal Year 2024 Results*, U.S. SECURITIES AND EXCHANGE COMMISSION, https://www.sec.gov/Archives/edgar/data/1652044/000165204425000010/googexhibit991q42024.htm (last visited Oct. 24, 2025).

[13] *Id.*

[14] "Once you've installed the tracking code and have elected to share your data, the Benchmarking Service accrues data from all the sites and pages on which you've placed the Google Analytics tracking code." *See Using the Tracking Code*, GOOGLE, https://support.google.com/analytics/answer/1011401?hl=en&sjid=5069058522802209555-NA (last visited Oct. 24, 2025).

[15] "Google signals are session data from sites and apps that Google associates with users who have signed in to their Google accounts, and who have turned on Ads Personalization. This association of data with these signed-in users is used to enable cross-device remarketing, and cross-device key events export to Google Ads." *See [GA4] Activate Google signals for Google Analytics properties*, GOOGLE, https://support.google.com/analytics/answer/9445345?hl=en#zippy=%2Cin-this-article (last visited Oct. 24, 2025).

63.    Google Analytics is automatically configured to capture a large amount of data, such as when a user visits a particular web page, that web page's URL and metadata, button clicks, etc.[16]

64.    Advertisers, such as Defendant, can track other user actions and can create their own tracking parameters by building a "custom dimension."[17] These are descriptive attributes (such as user type, membership level, or product category) that you define and collect in addition to the default dimensions provided by Google Analytics. They allow you to segment and analyze your data in ways that are not possible with standard fields.

65.    Central to Google Analytics is a snippet of code (commonly referred to as the Global Site Tag ("gtag.js") or Google Analytics tag) that, once embedded, enables the tracking of website visitors' actions and the collection of related data.[18]

66.    According to Google's documentation, this snippet helps determine when users perform key actions—e.g., viewing a page, clicking a link, or making a purchase—so that site owners can accurately measure engagement and conversions.[19]

67.    This data is transmitted alongside a user's including Google Client IDs ("CID"), a unique numeric string which specifically identifies a Google user. The CID is a persistent identifier that can be linked to specific individuals across apps, browsers, and devices and helps businesses understand user engagement and identify trends.

68.    Importantly, "Google makes no representations that Google Analytics satisfies HIPAA requirements and does not offer Business Associate Agreements in connection with this service."[20]

---

[16] *[GA4] Data Collection*, GOOGLE, https://support.google.com/analytics/answer/11593727?hl=en (last visited Oct. 26, 2025).

[17] *[GA4] About Custom Events And Metrics*, GOOGLE, https://support.google.com/analytics/answer/14240153?hl=en (last visited Oct. 26, 2025); *see also [GA4] Create User-Scoped Custom Dimensions*, GOOGLE, https://support.google.com/analytics/answer/14239618?hl=en&ref_topic=11151952&sjid=11867313698080218124-NA#zippy=%2Canalyze-the-custom-dimension-in-a-report%2Canalyze-the-custom-dimension-in-an-exploration%2Cbuild-an-audience-using-the-dimension (last visited Oct. 24, 2025).

[18] Get Started with Google Tag https://support.google.com/analytics/topic/12403939?hl=en&ref_topic=14088998&sjid=12500510714154886837-NC (last visited Jan. 9, 2026).

[19] About events, https://support.google.com/analytics/answer/1033068 (last visited Jan. 9, 2026).

[20] *Google, HIPAA And Google Analytics*, GOOGLE, https://support.google.com/analytics/answer/13297105?hl=en (last visited Oct. 24, 2025).

CLASS ACTION COMPLAINT

Google is extremely clear about this and goes on to state that "Customers who are subject to HIPAA must not use Google Analytics in any way that implicates Google's access to, or collection of, PHI, and may only use Google Analytics on pages that are not HIPAA-covered."[21]

69.    Google Signals is a cross-device tracking tool offered by Google and used in conjunction with data gathered by Analytics. The eponymous "signals" are session data from sites and apps that Google associates with users who have signed in to their Google accounts.

70.    When a visitor has a Google profile, Google Signals allows the information collected to be associated with a user's Google account. This feature is on by default.[22] This associates the data collected by Google Analytics with their name and Google profile, *i.e.*, their real-world identity. Likewise, Google maintains "shadow profiles" on users without Google accounts and links the information collected to the user's real-world identity using their shadow profile.[23]

71.    Google Ads uses a number of different cookies to track users across sites and match their browsing activity to their personal Google profile. This technology associates a user's real-world identity with their browsing data.

72.    Google explicitly states that "[w]e store a record of the ads we serve in our logs. These server logs typically include your web request, IP address, browser type, browser language, the date and time of your request, and one or more cookies that may uniquely identify your browser or, if you are signed-in, that may uniquely identify you."[24]

73.    Google has faced extensive criticism for its aggressive retargeting efforts. In 2016, the company changed its privacy policy to allow it to associate the data gathered through DoubleClick and other marketing cookies with data gathered through Google's suite of products, with the result that Google's cookies "may now be customized to [an individual] based on your name and other

---

[21] *Id.*

[22] *Ads Personalization Settings In Google's Publisher Ad Tags*, GOOGLE, https://support.google.com/adsense/answer/7670312?hl=en (last visited Oct. 24, 2025).

[23] *Google's Shadow Profile: A Dossier Of Consumers Online And Real World Life*, Gov.UK (Feb. 2019), https://assets.publishing.service.gov.uk/media/5e1c4985e5274a06b7450a13/Oracle_-_Response_to_SoS_-_Appendix_4_-_Google_Shadow_Profiles.pdf.

[24] *Google Privacy and Terms*, GOOGLE, https://policies.google.com/technologies/ads (last visited November 17, 2025).

information Google knows about you. It also means that Google could now, if it wished to, build a complete portrait of a user by name, based on everything they write in email, every website they visit and the searches they conduct."[25]

74. Transmission of data to Google DoubleClick is especially revealing. DoubleClick is not an analytics tool–it is Google's dedicated advertising technology platform designed specifically to:

    i. Build comprehensive user profiles across websites;

    ii. Enable behavioral targeting and retargeting;

    iii. Facilitate real-time bidding for advertising inventory;

    iv. Track conversions and attribute sales to specific ads;

    v. Create "lookalike audiences" for expanded targeting.[26]

75. If the user is signed into their Google account, data generated by their use of the Website can be shared and cross-referenced across the platforms. As described above in the court in *Brown 685 F. Supp. 3d at 919-20*, Google's tools collect a tremendous amount of data on users and can arguably identify individuals even without correlating this data as Google Analytics by itself collects browser and device information, the user's approximate location, their behavior on the website, and more.[27]

### D. Ahrefs Tracking Technologies

76. Ahrefs is an online marketing tool that "help[s] marketers make their brands discoverable—and unmissable—online".[28]

77. The company provides a number of different online marketing and analytics tools that helps website owners to track the performance of their website.

78. These tools focus on search engine optimization and conversion tracking.

[25] *Google Has Quietly Dropped Ban on Personally Identifiable Web* Tracking, Julia Angwin, https://www.propublica.org/article/google-has-quietly-dropped-ban-on-personally-identifiable-web-tracking (last accessed November 19, 2025).
[26] About Audience Segments, https://support.google.com/google-ads/answer/2497941?hl=en (last visited Dec. 16, 2025).
[27] https://support.google.com/analytics/answer/11593727?hl=en (last visited November 19, 2025).
[28] About Ahrefs, https://ahrefs.com/about (last visited March 12, 2026).

79.     Ahrefs offers Ahrefs Web Analytics, a tool that website owners can use to track how users interact with their website.[29]

### E.     The Implementation of the Tracking Technologies on the Website

80.     The Tracking Technologies are programmable, meaning that Defendant controls which of the web pages on the Website contain the Tracking Technologies, and which events are tracked and transmitted to the Information Recipients.

81.     A user's web browser executes the Tracking Technologies' code via instructions within each web page of Defendant's Website to communicate certain information (within parameters set by Defendant) directly to the corresponding Information Recipients.

82.     The Information Recipients deposits cookies onto Plaintiff's and Class members' computing devices. These are cookies associated with users' accounts with the Information Recipients and can therefore be associated with that user's real-world identity.

83.     When a user accesses a web page that is hosting the Tracking Technologies, like those on the Website, their communications with the Website are instantaneously and surreptitiously duplicated and sent to the Information Recipients' servers—traveling from the user's browser to the servers.

84.     This second, secret transmission contains the original GET request sent to the Website, along with additional data that Defendant configured the Tracking Technologies to collect. This transmission is initiated by the Tracking Technologies' code and concurrent with the communications with the Website. Two sets of code are thus automatically run as part of the browser's attempt to load and read Defendant's Website—Defendant's own code and the Tracking Technologies' embedded code.

85.     Accordingly, during the same transmissions, the Website routinely provides the Information Recipients with its patients' PII such as IP addresses, locations, and device IDs, as well as other information input into interactions with Defendant's Website. This information, when combined with information retrieved from the Information Recipients' cookies on the user's device,

---

[29] About Ahrefs Web Analytics, https://help.ahrefs.com/en/articles/10247870-about-ahrefs-web-analytics (last visited March 12, 2026).

allows the Information Recipients to associate their activity on the Website with existing accounts with those Information Recipients—in other words, revealing their identity. The Information Recipients are thus able to associate with an individual's real-world identity information such as their medical searches, location information, treatment requests, insurance information (or lack thereof), and the web pages they view relating to medical conditions and/or treatments, among other sensitive and personal information. This is precisely the type of identifying information that HIPAA requires health care providers to de-identify to protect the privacy of patients.[30] The Information Recipients are easily able to determine Plaintiff's and Class members' identities using account identifiers known to the Information Recipients, IP addresses, and/or other identifying information that was improperly disclosed.

86.   After intercepting and collecting this information, the Information Recipients process, analyze, and assimilate it into datasets for use by advertisers to target individuals.

87.   Data collected through the Tracking Technologies is linked to the user's accounts with the Information Recipients, which generally contain a wide range of demographic and other information about the user, including pictures, personal interests, work history, and other details.

88.   Even if a user lacks an account with an information recipient, the data collected by the Tracking Technologies is linked with shadow profiles maintained by the Information Recipients that contain a similar set of information about the user.

89.   Importantly, the Private Information disclosed via the Tracking Technologies allows the Information Recipients to know the identity of a specific patient as well as the fact that they are seeking confidential medical care and the type of medical care being sought. The Information Recipients then use that information to sell advertising to Defendant and other advertisers and/or sell that information to marketers who will online target Plaintiff and Class members.

90.   The Tracking Technologies are routinely used to target specific customers by utilizing data to build profiles for the purposes of retargeting—i.e., serving online advertisements to people

---

[30] *Guidance Regarding Methods for De-identification of Protected Health Information in Accordance with the Health Insurance Portability and Accountability Act (HIPAA) Privacy Rule*, U.S. DEPARTMENT OF HEALTH AND HUMAN SERVICES, https://www.hhs.gov/hipaa/for-professionals/privacy/special-topics/de-identification/index.html (last visited Oct. 24, 2025).

who have previously engaged with a business's website—and other marketing.

91.    Defendant used the data it collected from Plaintiff and Class members, without their consent, in an effort to improve their advertising and bolster their revenues.

**F.    The Implementation Of The Tracking Technologies On The Website**

92.    The Tracking Technologies are programmable, meaning that Defendant controls which of the webpages on the Website contain the Tracking Technologies, and which events are tracked and transmitted to the Information Recipients.

93.    A user's web browser executes the Tracking Technologies' code via instructions within each webpage of Defendant's Website to communicate certain information (within parameters set by Defendant) directly to the corresponding Information Recipients.

94.    When a user accesses a webpage that is hosting the Tracking Technologies, like those on the Website, their communications with the Website are instantaneously and surreptitiously duplicated and sent to Google's servers—traveling from the user's browser to the servers.

95.    This second, secret transmission contains the original GET request sent to the Website, along with additional data that Defendant configured the Tracking Technologies to collect. This transmission is initiated by the Tracking Technologies' code and concurrent with the communications with the Website. Two sets of code are thus automatically run as part of the browser's attempt to load and read Defendant's Website—Defendant's own code and Google's embedded code.

96.    Accordingly, during the same transmissions, the Website routinely provides the Information Recipients with its patients' Google Account IDs, IP addresses, and/or device IDs and the other information they input into Defendant's Website, including not only their medical searches, location information, treatment requests, insurance information (or lack thereof), and the webpages they view. This is precisely the type of identifying information that HIPAA requires healthcare providers to de-anonymize to protect the privacy of patients.[31] Plaintiffs' and Class Members'

---

[31]    *Guidance Regarding Methods for De-identification of Protected Health Information in Accordance with the Health Insurance Portability and Accountability Act (HIPAA) Privacy Rule*, HHS.gov, *available at* https://www.hhs.gov/hipaa/for-professionals/privacy/special-topics/de-identification/index.html (last visited Oct. 19, 2023).

CLASS ACTION COMPLAINT

identities can be easily determined based on Google account identifiers, IP address and/or reverse lookup from the collection of other identifying information that was improperly disclosed.

97.     After intercepting and collecting this information, the Information Recipients process, analyze, and assimilate it into datasets for use by advertisers to target individuals.

98.     Data collected through the Tracking Technologies is linked to the user's accounts with the Information Recipients, which generally contain a wide range of demographic and other information about the user, including pictures, personal interests, work history, and other details.

99.     Even if a user lacks an account with an information recipient, the data collected by the Tracking Technologies is linked with shadow profiles maintained by the Information Recipients that contain a similar set of information about the user.

100.    Importantly, the Private Information disclosed via the Tracking Technologies allows the Information Recipients to know the identity of a specific patient as well as the fact that they are seeking confidential medical care and the type of medical care being sought. The Information Recipients then use that information to sell advertising to Defendant and other advertisers and/or sells that information to marketers who will online target Plaintiffs and Class members.

101.    The Tracking Technologies are routinely used to target specific customers by utilizing data to build profiles for the purposes of retargeting—*i.e.*, serving online advertisements to people who have previously engaged with a business's website—and other marketing.

102.    Defendant used the data it collected from Plaintiffs and Class members, without their consent, in an effort to improve their advertising and bolster their revenues.

G.     *The Tracking Technologies Shared Plaintiff's Sensitive Private Information with Third Parties*

103.    Plaintiff and Class members submitted Private Information to Defendant's Website in order to research specific conditions, book health-related services, and more through the Website.

104.    Concurrently, this information was communicated from the Website (via the Tracking Technologies) to the Information Recipients.

105.    When a user visits the Website, the Tracking Technologies load the user's unique user ID from cookies stored in their browser. The Tracking Technologies track the user's activities on the

Website and correlate that data with the user's real-world identity and their activities across other sites and platforms.

106. The website sends to Google—through DoubleClick cookies—that the visitor is viewing the skin cancer treatments webpage (url; tiba), including with what appears to be the audience/user ID for the specific visitor (auid):



107. Clicking on "Request an Appointment" redirects the visitor to the services webpage;

CLASS ACTION COMPLAINT

the website sends URL and page view events to Ahrefs, Google Analytics, and Doubleclick (pictured, referred to as Google Ad Services, see "hn"), see "url" and "ref":

108.    The website sends to Google that the visitor is viewing (en) the appointment booking webpage (dl; dt):



CLASS ACTION COMPLAINT

109. The website sends to Google Analytics that the visitor took a step to book an

| Query String Parameters | View source | View URL-encoded |
|---|---|---|
| v | 2 | |
| tid | G-51T6TPJEKZ | |
| gtm | 45je5bi1v878258938z89135546825za200zb9135546825zd9135546825 | |
| _p | 1763747817177 | |
| _gaz | 1 | |
| gcd | 13l3l3l3l1l1 | |
| npa | 0 | |
| dma | 0 | |
| cid | 1352548247.1763739514 | |
| ul | en-us | |
| sr | 1920x1080 | |
| uaa | arm | |
| uab | 64 | |
| uafvl | Chromium;142.0.7444.176|Google%20Chrome;142.0.7444.176|Not_A%20Brand;99.0.0.0 | |
| uamb | 0 | |
| uam | | |
| uap | macOS | |
| uapv | 14.2.1 | |
| uaw | 0 | |
| are | 1 | |
| frm | 0 | |
| pscdl | noapi | |
| _eu | AAAAAAQ | |
| _s | 2 | |
| tag_exp | 103116026~103200004~104527907~104528501~104684208~104684211~105322303~115583767~115938466~115938469~116184927~1161849 29~116217636~116217638~116251935~116251937 | |
| sid | 1763750490 | |
| sct | 3 | |
| seg | 0 | |
| dl | https://skinandcancerinstitute.com/locations/ | |
| dr | https://skinandcancerinstitute.com/services/ | |
| dt | We offer Dermatology Services & Skin Cancer Treatments Throughout CA, NV & AZ | |
| _tu | CA | |
| en | book_appointment | |
| _ss | 1 | |
| tfd | 2673389 | |

- 24 -

CLASS ACTION COMPLAINT

appointment (en) from the appointment booking webpage (dl; dt):

CLASS ACTION COMPLAINT

110. The Website then sends the visitor to nextpatient.co to finish booking their appointment. The nextpatient.co website sends to Google, through DoubleClick cookies, that the visitor has started the form (data) to make an appointment for "Bishop Dermatology & Skin Cancer" (tiba), aka "sci-bishop" (ref), for a reason numbered 9739 (url):

| random | 1763752357530 |
| cv | 11 |
| fst | 1763752357530 |
| bg | ffffff |
| guid | ON |
| async | 1 |
| en | form_start |
| gtm | 45je5bi1v878258938za200zd878258938xec |
| gcd | 13l3l3l3l1l1 |
| dma | 0 |
| tag_exp | 103116026~103200004~104527906~104528500~104684208~104684211~105391252~115583767~115938465~115938468~116184927~116184929~116217636~116217638~116474637 |
| u_w | 1920 |
| u_h | 1080 |
| url | https://nextpatient.co/p/1415/870411595/appt-book?reason_id=9739 |
| ref | https://nextpatient.co/p/sci-bishop/schedule?_gl=1*1xgkm15*_gcl_au*NjYyMzMxNTEuMTc2MzczOTUxNA..*_ga*MTM1MjU0ODI0Nv4xNzYzNzM5NTE0*_ga_51T6TPJEKZ*czE3NjM3NDY1MzckbzlkZzEkdDE3NjM3NDc4MTgkaiE2JGwwJGgw |
| frm | 0 |
| tiba | Make an appointment \| Bishop Dermatology & Skin Cancer |
| hn | www.googleadservices.com |
| npa | 0 |
| pscdl | noapi |
| auid | 66233151.1763739514 |
| uaa | arm |
| uab | 64 |
| uafvl | Chromium;142.0.7444.176\|Google%20Chrome;142.0.7444.176\|Not_A%20Brand;99.0.0.0 |
| uamb | 0 |
| uam | |
| uap | macOS |
| uapv | 14.2.1 |
| uaw | 0 |
| data | event=form_start |
| rfmt | 3 |
| fmt | 4 |

111. Through the use of the Tracking Technologies, Defendant has exposed the Private Information of Plaintiff and Class members to numerous third parties, including the Information Recipients. After providing her Private Information to Defendant, Plaintiff immediately began seeing targeted health ads referencing skin cancer treatment in addition to other treatments she had researched and/or received. Plaintiff has suffered significant mental distress and embarrassment arising from the implication that advertisers were aware of their medical conditions and the fear that her friends, family,

CLASS ACTION COMPLAINT

or colleagues might see these advertisements and thereby learn of her medical conditions.

112.    In sum, Plaintiff and Class members provided their Private Information to Defendant by browsing the Website, reviewing conditions and available treatments, scheduling appointments, researching issues, and, at all times throughout this process, had a reasonable expectation of privacy in the Private Information Defendant was collecting, including that Defendant would ensure that such Private Information remain secure and protected and only utilized for limited medical and health purposes.

**H.    *Defendant's Use of the Tracking Technologies Violated Users' Expectation of Privacy***

113.    Defendant breached Plaintiff's and Class members' right to privacy by unlawfully disclosing their Private Information to the Information Recipients. Specifically, Plaintiff and Class members had a reasonable expectation of privacy in the Private Information that they shared with Defendant.

114.    Defendant updates its Privacy Policy[32] and Terms of Service[33] on February 11 and 12, 2026, respectively.

115.    Notice of the Privacy Policy and Terms of Service consists of a small, inconspicuous off-blue text at the very bottom of the webpage. Most Users are likely to never even see this.

116.    A user is not prompted to review the privacy policy prior to booking an appointment, a process that requires inputting significant amounts of highly personal information.

117.    Prior to being updated, the Privacy Policy was very brief and appeared to be incomplete. The Privacy Policy discussed the situations in which PHI is disclosed to third parties. None of these situations discussed marketing purposes. It stated that the Website uses cookies but was vague as to how these are used and states that "Usage of a cookie is in no way linked to any personally identifiable information on our site."

118.    This claim is false because the Tracking Technologies surreptitiously collect and transmit Users' personally identifiable information. Moreover, the Privacy Policy failed to disclose

---

[32] Privacy Policy, Skin and Cancer Institute, https://skinandcancerinstitute.com/privacy/ (last visited March 6, 2026).
[33] Terms and Conditions, Skin and Cancer Institute, https://skinandcancerinstitute.com/terms-and-conditions/ (last visited March 6, 2026).

the true extent of the information collected and shared.

119.     Even after being updated, the Privacy Policy is still confusing and misleading. It now discloses use of the Google Tracking Technologies, but claims that they are only used "to measure the effectiveness of our online advertising and track appointment bookings on our website" and claims that this information is not used to for marketing purposes.

120.     By engaging in this improper sharing of information without Plaintiff's and Class members' consent, Defendant breached Plaintiff's and Class members' right to privacy and unlawfully disclosed their Private Information.

121.     Defendant appears to have added an arbitration provision and class action waiver to its Terms of Use when this policy was updated. Such a policy is unenforceable due to the lack of informed, actual consent described above.

## I.     *Defendant's Use of the Tracking Technologies Violates HIPAA*

122.     Under federal law, a health care provider may not disclose personally identifiable, non-public medical information about a patient, a potential patient, or household member of a patient for marketing purposes without the patient's express written authorization.[34]

123.     Guidance from the United States Department of Health and Human Services instructs health care providers that patient status alone is protected by HIPAA.

124.     HIPAA's Privacy Rule broadly defines protected health information ("PHI") as individually identifiable health information ("IIHI") that is "(i) transmitted by electronic media; (ii) maintained in electronic media; or (iii) transmitted or maintained in any other form or medium." 45 C.F.R. § 160.103.

125.     IIHI is defined as "a subset of health information, *including demographic information collected from an individual*" that is: (1) "created or received by a health care provider, health plan, employer, or health care clearinghouse"; (2) "[r]elates to the past, present, or future physical or mental health or condition of an individual; the provision of health care to an individual; or the past, present, or future payment for the provision of health care to an individual"; and (3) either (a) "identifies the

---

[34] HIPAA, 42 U.S.C. § 1320; 45 C.F.R. §§ 164.502; 164.508(a)(3), 164.514(b)(2)(i).

individual" or (b) "[w]ith respect to which there is a reasonable basis to believe the information can be used to identify the individual." 45 C.F.R. § 160.103 (emphasis added).

126.   Under the HIPAA de-identification rule, "health information is not individually identifiable only if": (1) an expert "determines that the risk is very small that the information could be used, alone or in combination with other reasonably available information, by an anticipated recipient to identify an individual who is a subject of the information" and "documents the methods and results of the analysis that justify such determination'"; or (2) "the following identifiers of the individual or of relatives, employers, or household members of the individual are removed:

> A. Names;
>
> …
>
> H.  Medical record numbers;
>
> …
>
> J.   Account numbers;
>
> …
>
> M.  Device identifiers and serial numbers;
>
> N.  Web Universal Resource Locators (URLs);
>
> O.  Internet Protocol (IP) address numbers;
>
> … and
>
> R.  Any other unique identifying number, characteristic, or code…"

45 C.F.R. § 164.514. Additionally, the covered entity must not "have actual knowledge that the information could be used alone or in combination with other information to identify an individual who is a subject of the information." 45 C.F.R. § 164.514(b)(2)(ii).

127.   The HIPAA Privacy Rule requires any "covered entity"—which includes health care providers—to maintain appropriate safeguards to protect the privacy of PHI and sets limits and conditions on the uses and disclosures that may be made of PHI without authorization. 45 C.F.R. §§ 160.103, 164.502.

128.   Even the fact that an individual is receiving a medical service, i.e., is a patient of a particular entity, can be PHI. The Department of Health and Human Services has instructed health

care providers that, while identifying information alone is not necessarily PHI if it were part of a public source such as a phonebook because it is not related to health data, "[i]f such information was listed with health condition, health care provision, or payment data, such as an indication that the individual was treated at a certain clinic, then this information would be PHI."[35]

129.    Consistent with this restriction, the HHS has issued marketing guidance that provides: With limited exceptions, the [Privacy] Rule requires an individual's written authorization before a use or disclosure of his or her protected health information can be made for marketing . . . Simply put, a covered entity may not sell protected health information to a business associate or any other third party for that party's own purposes. Moreover, covered entities may not sell lists of patients or enrollees to third parties without obtaining authorization from each person on the list.[36]

130.    Here, Defendant provided patient information to third parties in violation of the Privacy Rule.

131.    HIPAA also requires Defendant to "review and modify the security measures implemented . . . as needed to continue provision of reasonable and appropriate protection of electronic protected health information,"[37] and to "[i]mplement technical policies and procedures for electronic information systems that maintain electronic protected health information to allow access only to those persons or software programs that have been granted access rights."[38]

132.    Defendant further failed to comply with other HIPAA safeguard regulations as follows:

a.    Failing to ensure the confidentiality and integrity of electronic PHI that Defendant created, received, maintained, and transmitted in violation of 45 C.F.R. section 164.306(a)(1);

b.    Failing to implement policies and procedures to prevent, detect, contain, and correct security violations in violation of 45 C.F.R. section 164.308(a)(1);

c.    Failing to identify and respond to suspected or known security incidents and mitigate harmful effects of security incidents known to Defendant in violation of 45 C.F.R. section 164.308(a)(6)(ii);

---

[35] *See Guidance Regarding Methods for De-Identification of Protected Health Information in Accordance with the Health Insurance Portability and Accountability Act (HIPAA) Privacy Rule*, U.S. DEPARTMENT OF HEALTH AND HUMAN SERVICES, https://www.hhs.gov/hipaa/for-professionals/privacy/special-topics/de-identification/index.html, (last visited Oct. 24, 2025).
[36] *Marketing*, U.S. DEPARTMENT OF HEALTH AND HUMAN SERVICES, https://www.hhs.gov/hipaa/for-professionals/privacy/guidance/marketing/index.html (last visited Oct. 24, 2025).
[37] 45 C.F.R. § 164.306(c).
[38] 45 C.F.R. § 164.312(a)(1).

CLASS ACTION COMPLAINT

d.    Failing to protect against reasonably anticipated threats or hazards to the security or integrity of electronic PHI in violation of 45 C.F.R. section 164.306(a)(2);

e.    Failing to protect against reasonably anticipated uses or disclosures of electronic PHI not permitted under the privacy rules pertaining to individually identifiable health information in violation of 45 C.F.R. section 164.306(a)(3); and

f.    Failing to design, implement, and enforce policies and procedures that would establish physical and administrative safeguards to reasonably safeguard PHI in violation of 45 C.F.R. section 164.530(c).

133.    Commenting on a June 2022 report discussing the use of Tracking Technologies by hospitals and medical centers, David Holtzman, a health privacy consultant and a former senior privacy adviser in HHS OCR, which enforces HIPAA, stated, "I am deeply troubled by what [the hospitals] are doing with the capture of their data and the sharing of it … It is quite likely a HIPAA violation."[39]

134.    Defendant's placing a third-party tracking code on their Website is a violation of Plaintiff's and Class members' privacy rights under federal law. While Plaintiff do not bring a claim under HIPAA itself, this violation demonstrates Defendant's wrongdoing relevant to other claims and establishes its duty to maintain patient privacy.

**J.    *Defendant's Use of the Tracking Technologies Violates OCR Guidance***

135.    In addition, the government has issued guidance warning that technologies like the Tracking Technologies may run afoul of federal privacy law when installed on health care websites.

136.    As mentioned previously, the HHS OCR has issued a Bulletin titled *Use of Online Tracking Technologies by HIPAA Covered Entities And Business Associates* which provides that health care organizations regulated under the HIPAA may use third-party tracking tools, such as Google Analytics or the Tracking Technologies *only in a limited way*, to perform analysis on data key to operations. They are not permitted, however, to use these tools in a way that may expose patients'

---

[39] *'Deeply Troubled'*: *Security experts worry about Facebook trackers on hospital sites*, ADVISORY BOARD (Mar. 18, 2023), https://www.advisory.com/daily-briefing/2022/06/17/data-trackers.

PHI to these vendors.[40]

137.    According to the Bulletin, Defendant has violated HIPAA rules by implementing the Tracking Technologies.[41]

138.    The bulletin discusses the types of harm that disclosure may cause to the patient:

An impermissible disclosure of an individual's PHI not only violates the Privacy Rule but also may result in a wide range of additional harms to the individual or others. For example, an impermissible disclosure of PHI may result in identity theft, financial loss, *discrimination, stigma, mental anguish, or other serious negative consequences to the reputation, health, or physical safety of the individual or to others identified in the individual's PHI.* Such disclosures can reveal incredibly sensitive information about an individual, *including diagnoses, frequency of visits to a therapist or other health care professionals, and where an individual seeks medical treatment.* While it has always been true that regulated entities may not impermissibly disclose PHI to tracking technology vendors, *because of the proliferation of tracking technologies collecting sensitive information, now more than ever, it is critical for regulated entities to ensure that they disclose PHI only as expressly permitted or required by the HIPAA Privacy Rule.*[42]

139.    Plaintiff and Class members face the same risks warned of above.

140.    Defendant has shared Plaintiff's and Class members' IIHI and PHI, including, among other things: descriptions about medical conditions patients are seeking treatment for; medical history; the names of their doctors; the frequency with which they take steps to obtain health care for certain conditions; and where they seek medical treatment. This information is, as described in the Bulletin, "highly sensitive."

141.    The Bulletin goes on to make clear how broad the government's view of protected information is in the following examples:

If an individual were looking at a hospital's webpage listing its oncology services to seek a second opinion on treatment options for their brain tumor, the collection and transmission of the individual's IP address, geographic location, or other identifying information showing their visit to that webpage is a disclosure of PHI to the extent that the information is both identifiable and related to the individual's health or future health care.[43]

142.    HHS provides another example:

---

[40] *See* HHS OCR Bulletin, *supra* n. 4.
[41] *See id.* ("disclosures of PHI to tracking technology vendors for marketing purposes, without individuals' HIPAA-compliant authorizations, would constitute impermissible disclosures").
[42] *Id.* (emphasis added.)
[43] *Id.*

[T]racking technologies might collect an individual's email address, or reason for seeking health care typed or selected by an individual, when the individual visits a regulated entity's webpage and makes an appointment with a health care provider or enters symptoms in an online tool to obtain a health analysis. In this example, the regulated entity is disclosing PHI to the tracking technology vendor, and thus the HIPAA Rules apply. This is because, unlike the general situation for many unauthenticated webpages, the information collected in this example meets the definition of IIHI.[44]

143.    Crucially, the government's Bulletin continues:

*All such [individually identifiable health information ("IIHI")] collected on a regulated entity's website or mobile app generally is PHI, even if the individual does not have an existing relationship with the regulated entity and even if the IIHI, such as IP address or geographic location, does not include specific treatment or billing information like dates and types of health care services.*[45]

144.    Each and every transmission via the Tracking Technologies shares, at a minimum, the user's IP address and information about the webpage they are on. As detailed above, many of the Information Recipients use persistent, pseudonymous cookies that track users across the entire Internet. Defendant's use of the Tracking Technologies ensures that the Information Recipients are able to add significant amounts of IIHI concerning Plaintiff and Class members to this trove of information. Users' IP address, in combination with the types of information shown in the screenshots above, is unquestionably IIHI, the release of which is a clear HIPAA violation.

145.    Defendant's sharing of Private Information to the Information Recipients violated Plaintiff's and Class members' rights.

**K.      Defendant Violated Industry Standards**

146.    It is a cardinal rule that a medical provider's duty of confidentiality is embedded in the physician-patient and hospital-patient relationship.

147.    Defendant's use of the Tracking Technologies violates Federal Trade Commission ("FTC") data security guidelines. The FTC has promulgated numerous guides for businesses which highlight the importance of implementing reasonable data security practices.

148.    The FTC's October 2016 publication *Protecting Personal Information: A Guide for Business*[46] established cyber security guidelines for businesses.

---

[44] *Id.*

[45] *Id.* (emphasis added.)

[46] *Protecting Personal Information A Guide for Business*, FEDERAL TRADE COMMISSION,

149.    These guidelines state that businesses should protect the personal patient information they keep; properly dispose of personal information that is no longer needed; encrypt information stored on computer networks; understand their network vulnerabilities; and implement policies to correct any security problems.

150.    Defendant failed to implement these basic, industry-wide data security practices.

**L.    Users' Reasonable Expectation of Privacy**

151.    Plaintiff and Class members were aware of Defendant's duty of confidentiality when they sought medical services from Defendant.

152.    Indeed, at all times when Plaintiff and Class members provided their IIHI and PHI to Defendant, they had a reasonable expectation that the information would remain confidential and that Defendant would not share the Private Information with third parties for a commercial purpose, unrelated to patient care.

153.    Privacy polls and studies show that the overwhelming majority of Americans consider obtaining an individual's affirmative consent before a company collects and shares its customers' data to be one of the most important privacy rights.

154.    For example, a Consumer Reports study shows that 92% of Americans believe that Internet companies and websites should be required to obtain consent before selling or sharing consumer data, and the same percentage believe those companies and websites should be required to provide consumers with a complete list of the data that is collected about them.[47]

155.    Personal data privacy and obtaining consent to share Private Information are material to Plaintiff and Class members.

**M.    IP Addresses are Protected Health Information**

156.    Defendant improperly disclosed Plaintiff's and Class members' computer IP addresses to the Information Recipients through their use of the Tracking Technologies *in addition to* unique

https://www.ftc.gov/system/files/documents/plain-language/pdf-0136_proteting-personal-information.pdf (last visited Oct. 24, 2025).

[47] *Consumers Less Confident About Healthcare, Data Privacy, and Car Safety, New Survey Finds,* CONSUMER REPORTS (May 11, 2017), https://www.consumerreports.org/consumer-reports/consumers-less-confident-about-healthcare-data-privacy-and-car-safety-a3980496907/.

personal identifiers such as phone numbers, email addresses, dates of birth, services selected, medical conditions, treatments, provider information, and appointment information.

157. An IP address is a number that identifies the address of a device connected to the Internet.

158. IP addresses are used to identify and route communications on the Internet.

159. IP addresses of individual Internet users are used by Internet service providers, websites, and third-party tracking companies to facilitate and track Internet communications.

160. Google tracks IP addresses associated with Internet users. Facebook, Google, and other third-party marketing companies track IP addresses for targeting individual homes and their occupants with advertising.

161. Under HIPAA, an IP address is considered personally identifiable information, defining personally identifiable information as including "any unique identifying number, characteristic or code" and specifically listing IP addresses among examples. 45 C.F.R. § 164.514 (2).

162. HIPAA further classifies information as personally identifiable where the covered entity has "actual knowledge that the information could be used alone or in combination with other information to identify an individual who is a subject of the information." 45 C.F.R. § 164.514(2)(ii); *see also*, 45 C.F.R. § 164.514(b)(2)(i)(O).

163. Consequently, Defendant's disclosure of Plaintiff's and Class members' IP addresses violated HIPAA and industry-wide privacy standards.

**N. *Defendant Benefitted From and Was Enriched by the Use of the Tracking Technologies that Enabled the Unauthorized Disclosures Alleged Herein***

164. The purpose of the Tracking Technologies on Defendant's Website was to improve marketing and thereby boost revenues.

165. In exchange for disclosing the Private Information of their users and patients, Defendant is compensated by the Information Recipients in the form of enhanced advertising services and more cost-efficient marketing on their platform.

166. Retargeting is a form of online marketing that targets users with ads based on previous Internet communications and interactions.

CLASS ACTION COMPLAINT

167.    Defendant retargeted patients and potential patients to get more people to use their services. These patients include Plaintiff and Class members.

168.    Thus, utilizing the Tracking Technologies benefits Defendant by, among other things, reducing the cost of advertising and retargeting.

169.    Moreover, Plaintiff's and Class members' Private Information had value and Defendant's disclosure and interception harmed Plaintiff and the Class.

170.    Conservative estimates suggest that in 2018, Internet companies earned $202 per American user from mining and selling data.[48] That figure is only due to keep increasing; estimates for 2022 are as high as $434 per user, for a total of more than $200 billion industry wide.[49]

171.    The value of health data in particular is well-known and has been reported on extensively in the media. For example, Time Magazine published an article in 2017 in which it described the extensive market for health data, observing that the market for information was both lucrative and a significant risk to privacy.[50]

172.    Similarly, CNBC published an article in 2019 in which it observed that "[d]e-identified patient data has become its own small economy: There's a whole market of brokers who compile the data from providers and other health-care organizations and sell it to buyers."[51]

173.    Tech companies are under particular scrutiny because they already have access to a massive trove of information about people, which they use to serve their own purposes, including potentially micro-targeting advertisements to people with certain health conditions.

174.    Policymakers are proactively calling for a revision and potential upgrade of the HIPAA privacy rules out of concern for what might happen as tech companies continue to march into the

---

[48] *See* Robert J. Shapiro, *What Your Data is Really Worth to Facebook*, WASHINGTON MONTHLY (July 12, 2019), https://washingtonmonthly.com/2019/07/12/what-your-data-is-really-worth-to-facebook/.
[49] *Id*.
[50] *See* Adam Tanner, *How Your Medical Data Fuels a Hidden Multi-Billion Dollar Industry,* TIME (Jan. 9, 2017), https://time.com/4588104/medical-data-industry/.
[51] *See* Christina Farr, *Hospital execs say they are getting flooded with requests for your health data* CNBC.COM (Dec. 18, 2019, at 7:02 PM), https://www.cnbc.com/2019/12/18/hospital-execs-say-theyre-flooded-with-requests-for-your-health-data.html.

CLASS ACTION COMPLAINT

medical sector.[52]

175.    Private Information is also a valuable commodity to identity thieves. As the FTC recognizes, identity thieves can use Private Information to commit an array of crimes that include identity theft and medical and financial fraud.[53] A robust "cyber black market" exists where criminals openly post stolen IIHI and PHI on multiple underground Internet websites, commonly referred to as the dark web.

176.    While credit card information and associated IIHI can sell for as little as $1–$2 on the black market, PHI can sell for as much as $363.[54]

177.    PHI is particularly valuable because criminals can use it to target victims with frauds that take advantage of their medical conditions.

178.    PHI can also be used to create fraudulent insurance claims, to facilitate the purchase and resale of medical equipment, and to help criminals gain access to prescriptions for illegal use or sale.

179.    Medical identity theft can result in inaccuracies in medical records, costly false claims, and life-threatening consequences. If a victim's health information is comingled with other records, it can lead to misdiagnoses or mistreatment.

180.    The FBI Cyber Division issued a Private Industry Notification on April 8, 2014, that advised the following:

> Cyber criminals are selling [medical] information on the black market at a rate of $50 for each partial EHR, compared to $1 for a stolen social security number or credit card number. EHR can then be used to file fraudulent insurance claims, obtain prescription medication, and advance identity theft. EHR theft is also more difficult to detect, taking almost twice as long as normal identity theft.[55]

181.    Cybercriminals often trade stolen Private Information on the black market for years

---

[52] *Id.*

[53] *Warning Signs of Identity Theft,* FEDERAL TRADE COMMISSION CONSUMER ADVICE (Sept. 2024)*,* https://www.consumer.ftc.gov/articles/0271-warning-signs-identity-theft.

[54] *Data Breaches: In the Healthcare Sector,* CYBER FOR INTERNET SECURITY, https://www.cisecurity.org/blog/data-breaches-in-the-healthcare-sector/ (last visited Oct. 24, 2025).

[55] FBI Cyber Division, *Health Care Systems and Medical Devices at Risk for Increased Cyber Intrusions for Financial Gain,* NATIONAL SECURITY ARCHIVE (Apr. 8, 2014), https://nsarchive.gwu.edu/sites/default/files/documents/5986979/National-Security-Archive-Department-of-Justice.pdf.

CLASS ACTION COMPLAINT

following a breach or disclosure. Stolen Private Information can be posted on the Internet, making it publicly available.

182. Defendant gave away Plaintiff's and Class members' communications and transactions on its Website without permission.

183. The unauthorized access to Plaintiff's and Class members' private and Personal Information has diminished the value of that information, resulting in harm to Website users, including Plaintiff and Class members.

184. Plaintiff suffered damages in the form of (a) invasion of privacy; (b) lost time and opportunity costs associated with attempting to mitigate the actual consequences of the invasion of privacy; (c) diminution of value of the Private Information; (d) statutory damages; (e) the continued and ongoing risk to their Private Information; (f) lost benefit of the bargain; and (g) the continued and ongoing risk of harassment, spam, and targeted advertisements specific to Plaintiff's medical conditions and other confidential information they communicated to Defendant via the Website.

185. Plaintiff have a continuing interest in ensuring that future communications with Defendant are protected and safeguarded from future unauthorized disclosure.

## TOLLING

186. Any applicable statute of limitations has been tolled by the "delayed discovery" rule. Plaintiff did not know—and had no way of knowing—that their Private Information was intercepted and unlawfully disclosed to the Information Recipients because Defendant kept this information secret. Plaintiff first discovered that her information had been misused in this way in approximately September of 2025.

## CLASS ALLEGATIONS

187. This action is brought by the named Plaintiff on their behalf and on behalf of a proposed Class of all other persons similarly situated under Federal Rules of Civil Procedure 23(b)(2), 23(b)(3), and 23(c)(4).

188. Plaintiff proposes the following Nationwide Class definition:

> All persons residing in the United States who used Defendant's Website and whose Private Information was disclosed to the Information Recipients without their consent.

189. Plaintiff propose the following California Subclass definition, subject to amendment as appropriate:

> All persons residing in the State of California who used Defendant's Website and whose Private Information was disclosed to the Information Recipients without their consent.

190. Excluded from the proposed Classes are any claims for personal injury, wrongful death, or other property damage sustained by the Classes; and any Judge conducting any proceeding in this action and members of their immediate families.

191. Plaintiff reserves the right to amend the definitions of the Classes or add subclasses if further information and discovery indicate that the definitions of the Classes should be narrowed, expanded, or otherwise modified.

192. <u>Numerosity</u>. The Classes are so numerous that the individual joinder of all members is impracticable. There are at least thousands that have been impacted by Defendant's actions. Moreover, the exact number of those impacted is generally ascertainable by appropriate discovery and is in the exclusive control of Defendant.

193. <u>Commonality</u>. Common questions of law or fact arising from Defendant's conduct exist as to all members of the Classes, which predominate over any questions affecting only individual Class members. These common questions include, but are not limited to, the following:

a) Whether and to what extent Defendant had a duty to protect the Private Information of Plaintiff and Class members;

b) Whether Defendant had duties not to disclose the Private Information of Plaintiff and Class members to unauthorized third parties;

c) Whether Defendant violated their own Privacy Policy by disclosing the Private Information of Plaintiff and Class members to the Information Recipients;

d) Whether Defendant adequately, promptly, and accurately informed Plaintiff and Class members that their Private Information would be disclosed to third parties;

e) Whether Defendant violated the law by failing to promptly notify Plaintiff and Class members that their Private Information was being disclosed without their consent;

f)      Whether Defendant adequately addressed and fixed the practices which permitted the unauthorized disclosure of users' Private Information;

g)      Whether Defendant engaged in unfair, unlawful, or deceptive practices by failing to keep the Private Information belonging to Plaintiff and Class members free from unauthorized disclosure;

h)      Whether Defendant violated the statutes asserted as claims in this Complaint;

i)      Whether Plaintiff and Class members are entitled to actual, consequential, and/or nominal damages as a result of Defendant's wrongful conduct;

j)      Whether Defendant knowingly made false representations as to their data security and/or Privacy Policy practices;

k)      Whether Defendant knowingly omitted material representations with respect to their data security and/or Privacy Policy practices; and

l)      Whether Plaintiff and Class members are entitled to injunctive relief to redress the imminent and currently ongoing harm faced as a result of the Defendant's disclosure of their Private Information.

194.    Typicality. Plaintiff's claims are typical of those of other Class members because Plaintiff's Private Information, like that of every other Class member, was compromised as a result of Defendant's incorporation and use of the Tracking Technologies.

195.    Adequacy. Plaintiff will fairly and adequately represent and protect the interests of the members of the Class in that Plaintiff have no disabling conflicts of interest that would be antagonistic to those of the other members of the Class. Plaintiff seeks no relief that is antagonistic or adverse to the members of the Class and the infringement of the rights and the damages Plaintiff has suffered are typical of other Class members. Plaintiff has also retained counsel experienced in complex class action litigation, and Plaintiff intends to prosecute this action vigorously.

196.    Predominance. Defendant has engaged in a common course of conduct toward Plaintiff and Class members in that Plaintiff's and Class members' data was unlawfully stored and disclosed to unauthorized third parties, including the Information Recipients, in the same way. The common issues arising from Defendant's conduct affecting Class members set out above predominate over any

individualized issues. Adjudication of these common issues in a single action has important and desirable advantages of judicial economy.

197.   Superiority. A class action is superior to other available methods for the fair and efficient adjudication of the controversy. Class treatment of common questions of law and fact is superior to multiple individual actions or piecemeal litigation. Absent a class action, most Class members would likely find that the cost of litigating their individual claim is prohibitively high and would therefore have no effective remedy. The prosecution of separate actions by individual Class members would create a risk of inconsistent or varying adjudications with respect to individual Class members, which would establish incompatible standards of conduct for Defendant. In contrast, the conduct of this action as a class action presents far fewer management difficulties, conserves judicial resources and the parties' resources, and protects the rights of each Class member.

198.   Defendant has acted on grounds that apply generally to the Class as a whole so that class certification, injunctive relief, and corresponding declaratory relief are appropriate on a class-wide basis.

199.   Likewise, particular issues under Fed. R. Civ. P. 23(c)(4) are appropriate for certification because such claims present only particular, common issues, the resolution of which would advance the disposition of this matter and the parties' interests therein. Such particular issues include, but are not limited to:

a)   Whether Defendant owed a legal duty to Plaintiff and the Classes to exercise due care in collecting, storing, and safeguarding their Private Information and not disclosing it to unauthorized third parties;

b)   Whether Defendant breached a legal duty to Plaintiff and Class members to exercise due care in collecting, storing, using, and safeguarding their Private Information;

c)   Whether Defendant failed to comply with their own policies and applicable laws, regulations, and industry standards relating to data security;

d)   Whether Defendant adequately and accurately informed Plaintiff and Class members that their Private Information would be disclosed to third parties;

e) Whether Defendant failed to implement and maintain reasonable security procedures and practices appropriate to the nature and scope of the information disclosed to third parties;

f) Whether Class members are entitled to actual, consequential, and/or nominal damages and/or injunctive relief as a result of Defendant's wrongful conduct.

200. Finally, all members of the proposed Classes are readily ascertainable. Defendant has access to Class members' names and addresses affected by the unauthorized disclosures that have taken place.

## CAUSES OF ACTION
### COUNT I
### NEGLIGENCE
***(On behalf of Plaintiff and the Nationwide Class)***

201. Plaintiff re-alleges and incorporates by reference the allegations above as if fully set forth herein.

202. Upon accepting, storing, and controlling the Private Information of Plaintiff and the Classes, Defendant owed, and continues to owe, a duty to Plaintiff and the Class to exercise reasonable care to secure, safeguard and protect their highly sensitive Private Information.

203. Defendant breached this duty by failing to exercise reasonable care in safeguarding and protecting Plaintiff's and Class members' Private Information from unauthorized disclosure.

204. It was reasonably foreseeable that Defendant's failures to exercise reasonable care in safeguarding and protecting Plaintiff's and Class members' Private Information through their use of the Tracking Technologies would result in unauthorized third parties, such as the Information Recipients, gaining access to such Private Information for no lawful purpose.

205. Defendant's duty of care to use reasonable measures to secure and safeguard Plaintiff's and Class members' Private Information arose due to the special relationship that existed between Defendant and their patients, which is recognized by statute, regulations, and the common law.

206. In addition, Defendant had a duty under HIPAA and state privacy laws, which were enacted with the objective of protecting the confidentiality of patients' health care information and set forth the conditions under which such information can be used, and to whom it can be disclosed.

- 42 -

HIPAA and state privacy laws not only apply to health care providers and the organizations they work for, but to any entity that may have access to health care information about a patient that—if it were to fall into the wrong hands—could present a risk of harm to the patient's finances or reputation.

207. Defendant's own conduct also created a foreseeable risk of harm to Plaintiff and Class members and their Private Information. Defendant's misconduct included the failure to (1) secure Plaintiff's and Class members' Private Information; (2) comply with industry standard data security practices; (3) implement adequate Website and event monitoring; and (4) implement the systems, policies, and procedures necessary to prevent unauthorized disclosures resulting from the use of the Tracking Technologies.

208. As a direct result of Defendant's breach of their duty of confidentiality and privacy and the disclosure of Plaintiff's and Class members' Private Information, Plaintiff and the Class have suffered damages that include, without limitation, loss of the benefit of the bargain, increased infiltrations into their privacy through spam and targeted advertising they did not ask for, loss of privacy, loss of confidentiality, embarrassment, emotional distress, humiliation, and loss of enjoyment of life.

209. Defendant's wrongful actions and/or inactions and the resulting unauthorized disclosure of Plaintiff's and Class members' Private Information constituted (and continue to constitute) negligence at common law.

210. Plaintiff and the Class are entitled to recover damages in an amount to be determined at trial.

## COUNT II
## INVASION OF PRIVACY
### (On behalf of Plaintiff and the Nationwide Class)

211. Plaintiff re-alleges and incorporates by reference the allegations above as if fully set forth herein.

212. The highly sensitive and personal Private Information of Plaintiff and Class members consists of private and confidential facts and information regarding Plaintiff's and Class members' health that were never intended to be shared beyond private communications on the Website and the consideration of health care professionals.

- 43 -
CLASS ACTION COMPLAINT

213. Plaintiff and Class members had a legitimate expectation of privacy regarding their Private Information and were accordingly entitled to the protection of this Information against disclosure to unauthorized third parties, including the Information Recipients.

214. Defendant owed a duty to Plaintiff and Class members to keep their Private Information confidential.

215. Defendant's unauthorized disclosure of Plaintiff's and Class members' Private Information to the Information Recipients, third-party tech and marketing giants, is highly offensive to a reasonable person.

216. Defendant's willful and intentional disclosure of Plaintiff's and Class members' Private Information constitutes an intentional interference with Plaintiff's and Class members' interest in solitude and/or seclusion, either as to their person or as to their private affairs or concerns, of a kind that would be highly offensive to a reasonable person.

217. Defendant's conduct constitutes an intentional physical or sensory intrusion on Plaintiff's and Class members' privacy because Defendant facilitated the Information Recipients' simultaneous eavesdropping and wiretapping of confidential communications.

218. Defendant failed to protect Plaintiff's and Class members' Private Information and acted knowingly when they installed the Tracking Technologies onto the Website because the purpose of the Tracking Technologies is to track and disseminate individual's communications on the Website for the purpose of marketing and advertising.

219. Because Defendant intentionally and willfully incorporated the Tracking Technologies into the Website and encouraged individuals to use and interact with the Website and the health services thereon, Defendant had notice and knew that their practices would cause injury to Plaintiff and the Class.

220. As a proximate result of Defendant's acts and omissions, the private and sensitive Private Information, including the IIHI and PHI of Plaintiff and Class members, was disclosed to unauthorized third parties, causing Plaintiff and the Class to suffer damages.

221. Plaintiff, on behalf of herself and Class members, seeks compensatory damages for Defendant's invasion of privacy, which includes the value of the privacy interest invaded by

- 44 -

Defendant, loss of time and opportunity costs, lost benefit of the bargain, plus pre-judgment interest and costs.

222.    Defendant's wrongful conduct will continue to cause great and irreparable injury to Plaintiff and the Class since their Private Information is still maintained by Defendant and still in the possession of the Information Recipients, and the wrongful disclosure of the Private Information cannot be undone.

223.    Plaintiff and Class members have no adequate remedy at law for the injuries relating to Defendant's and unauthorized third parties' continued possession of their sensitive and confidential Private Information. A judgment for monetary damages will not undo Defendant's disclosure of the Private Information to unauthorized third parties who, upon information and belief, continue to possess and utilize the Private Information.

224.    Plaintiff, on behalf of herself and Class members, further seek injunctive relief to enjoin Defendant from intruding into the privacy and confidentiality of Plaintiff's and Class members' Private Information and to adhere to its common law, contractual, statutory, and regulatory duties.

**COUNT III**
**INVASION OF PRIVACY UNDER CALIFORNIA'S CONSTITUTION**
***(On behalf of Plaintiff and the Nationwide Class)***

225.    Plaintiff realleges and incorporates the paragraphs of this Complaint as if set forth herein.

226.    California's constitution creates a right to privacy, and further creates a right of action against private entities such as Defendant.

227.    The principal purpose of this constitutional right is to protect against unnecessary information gathering, use, and dissemination by public and private entities, including Defendant.

228.    To plead a California constitutional privacy claim, Plaintiff must show an invasion of (i) a legally protected privacy interest; (ii) where Plaintiff had a reasonable expectation of privacy in the circumstances; and (iii) conduct by Defendant constituting a serious invasion of privacy.

229.    Defendant has intruded upon the following legally protected privacy interests of Plaintiff and Class members, through, among other things: (i) the California Invasion of Privacy Act, as alleged herein; (ii) the California Constitution, which guarantees Californians the right to privacy;

(iii) the California Wiretap Acts as alleged herein

230.   Plaintiff and Class members had a reasonable expectation of privacy under the circumstances. Plaintiff and other Class members reasonably believed that Defendant would not share their sensitive medical information with unauthorized third parties.

231.   Such information is "personal information" under California law, which defines personal information as including "Internet or other electronic network activity information," such as "browsing history, search history, and information regarding a consumer's interaction with an internet website, application, or advertisement." Cal. Civ. Code § 1798.140. Defendant, in violation of Plaintiff's and other Class members' reasonable expectation of privacy, permits the Information Recipients to use cookies and other tracking technologies to collect, track, and compile users' Private Information, including their browsing history and website interactions.

232.   The data that Defendant allowed third parties to collect enables the Information Recipients to (and they in fact do), *inter alia*, create consumer profiles containing detailed information about a consumer's behavior, preferences, and demographics; create audience segments based on shared traits, and perform targeted advertising and marketing analytics. Further, the Information Recipients share user data and/or the user profiles to unknown parties to further their financial gain.

233.   Defendant's actions constituted a serious invasion of privacy in that it violated criminal laws on wiretapping and invasion of privacy. These acts constitute an egregious breach of social norms that is highly offensive.

234.   Defendant's intrusion into Plaintiff's privacy was also highly offensive to a reasonable person in that Defendant violated criminal and civil laws designed to protect individual privacy and against theft.

235.   Plaintiff and Class members have been damaged by Defendant's invasion of their privacy and are entitled to just compensation, including monetary damages.

236.   Plaintiff and Class members seek appropriate relief for that injury, including but not limited to, damages that will compensate them for the harm to their privacy interests as well as disgorgement of profits made by Defendant as a result of its intrusions upon Plaintiffs' and Class members' privacy.

**COUNT IV**
**BREACH OF CONFIDENCE**
*(On behalf of Plaintiff and the Nationwide Class)*

237.    Plaintiff re-alleges and incorporates by reference the allegations above as if fully set forth herein.

238.    Possessors of non-public medical information, such as Defendant, have a duty to keep such medical information completely confidential.

239.    Plaintiff and Class members had reasonable expectations of privacy in the responses and communications entrusted to Defendant through their Website, which included highly sensitive Private Information.

240.    Contrary to its duties as a health care institution with an online presence and its express promises of confidentiality, Defendant installed the Tracking Technologies to disclose and transmit to third parties Plaintiff's and Class members' Private Information, including data relating to Plaintiff's and Class members' health.

241.    These disclosures were made without Plaintiff's or Class members' knowledge, consent, or authorization.

242.    The third-party recipients include, but are limited to, the Information Recipients.

243.    As a direct and proximate cause of Defendant's unauthorized disclosures of Plaintiff's and Class members' Private Information, Plaintiff and Class members were damaged by Defendant's breach of confidentiality in that (a) sensitive and confidential information that Plaintiff and Class members intended to remain private is no longer private; (b) Plaintiff and Class members face ongoing harassment and embarrassment in the form of unwanted targeted advertisements; (c) Defendant eroded the essential confidential nature of health services that Plaintiff and Class members participated in; (d) general damages for invasion of their rights in an amount to be determined by a jury at trial; (e) nominal damages for each independent violation; (f) the unauthorized use of something of value (the highly sensitive Private Information) that belonged to Plaintiff and Class members and the obtaining of a benefit therefrom without Plaintiff's and Class members' knowledge or informed consent and without compensation to Plaintiff or Class members for the unauthorized use of such data; (g) diminishment of the value of Plaintiff's and Class members' Private Information; and (h) violation of property rights

Plaintiff and Class members have in their Private Information.

## COUNT V
### UNJUST ENRICHMENT
*(On behalf of Plaintiff and the Nationwide Class)*

244. Plaintiff re-alleges and incorporates by reference the allegations above as if fully set forth herein.

245. Defendant benefited from the use of Plaintiff's and Class members' Private Information and unjustly retained those benefits at Plaintiff's and Class members' expense.

246. Plaintiff and Class members conferred a benefit upon Defendant in the form of the monetizable Private Information that Defendant collected from them and disclosed to third parties, including the Information Recipients, without authorization and proper compensation.

247. Defendant consciously collected and used this information for their own gain, providing Defendant with economic, intangible, and other benefits, including substantial monetary compensation.

248. Defendant unjustly retained those benefits at the expense of Plaintiff and Class members because Defendant's conduct damaged Plaintiff and Class members, all without providing any commensurate compensation to Plaintiff or Class members.

249. The benefits that Defendant derived from Plaintiff and Class members were not offered by Plaintiff or Class members gratuitously and, thus, rightly belong to Plaintiff and Class members. It would be inequitable under unjust enrichment principles for Defendant to be permitted to retain any of the profit or other benefits wrongly derived from the unfair and unconscionable methods, acts, and trade practices alleged in this Complaint.

250. Defendant should be compelled to disgorge into a common fund for the benefit of Plaintiff and the Class all unlawful or inequitable proceeds that Defendant received, and such other relief as the Court may deem just and proper.

## COUNT VI
### VIOLATIONS OF ELECTRONIC COMMUNICATIONS PRIVACY ACT ("ECPA")
### 18 U.S.C. § 2511(1) *et seq.*
*(On behalf of Plaintiff and the Nationwide Class)*

251. Plaintiff re-alleges and incorporates by reference the allegations above as if fully set

- 48 -

forth herein.

252. The ECPA protects both sent and received communications.

253. The ECPA, specifically 18 U.S.C. § 2520(a), provides a private right of action to any person whose wire or electronic communications are intercepted, disclosed, or intentionally used in violation of Chapter 119.

254. The transmissions of Plaintiff's and Class members' Private Information to Defendant via Defendant's Website is a "communication" within the meaning of 18 U.S.C. § 2510(12).

255. The transmission of Private Information between Plaintiff and Class members and Defendant via their Website are "transfer[s] of signs, signals, writing, … data, [and] intelligence of [some] nature transmitted in whole or in part by a wire, radio, electromagnetic, photoelectronic, or photooptical system that affects interstate commerce" and are therefore "electronic communications" within the meaning of 18 U.S.C. § 2510(12).

256. The ECPA defines "content" when used with respect to electronic communications to "includ[e] any information concerning the substance, purport, or meaning of that communication." 18 U.S.C. § 2510(8).

257. The ECPA defines "interception" as the "acquisition of the contents of any wire, electronic, or oral communication through the use of any electronic, mechanical, or other device" and "contents … include any information concerning the substance, purport, or meaning of that communication." 18 U.S.C. § 2510(4), (8).

258. The ECPA defines "electronic, or other device" as "any device … which can be used to intercept a[n] … electronic communication[.]" 18 U.S.C. § 2510(5). The following constitute "devices" within the meaning of 18 U.S.C. § 2510(5):

   a. Plaintiff's and Class members' browsers;

   b. Plaintiff's and Class members' computing devices;

   c. Defendant's web servers; and

   d. The Tracking Technologies deployed by Defendant to effectuate the sending and acquisition of user and patient sensitive communications.

259. By utilizing and embedding the Tracking Technologies on their Website and/or servers,

CLASS ACTION COMPLAINT

Defendant intentionally intercepted, endeavored to intercept, and procured another person to intercept, the electronic communications of Plaintiff and Class members, in violation of 18 U.S.C. § 2511(1)(a).

260. Specifically, Defendant intercepted Plaintiff's and Class members' electronic communications via the Tracking Technologies, which tracked, stored, and unlawfully disclosed Plaintiff's and Class members' Private Information to the Information Recipients.

261. Defendant's intercepted communications included, but are not limited to, communications to/from Plaintiff and Class members regarding IIHI and PHI, including IP address, Google account information, and health information relevant to the screenings and treatment plans in which Plaintiff and Class members participated.

262. By intentionally disclosing or endeavoring to disclose the electronic communications of Plaintiff and Class members to the Information Recipients and, potentially, other third parties, while knowing or having reason to know that the information was obtained through the interception of an electronic communication in violation of 18 U.S.C. § 2511(1)(a), Defendant violated 18 U.S.C. § 2511(1)(c).

263. By intentionally using, or endeavoring to use, the contents of the electronic communications of Plaintiff and Class members, while knowing or having reason to know that the Information was obtained through the interception of an electronic communication in violation of 18 U.S.C. § 2511(1)(a), Defendant violated 18 U.S.C. § 2511(1)(d).

264. Defendant intentionally intercepted the contents of Plaintiff's and Class members' electronic communications for the purpose of committing a tortious act in violation of the Constitution or laws of the United States or of any State—namely, invasion of privacy, among others.

265. Defendant intentionally used the wire or electronic communications to increase its profit margins. Defendant specifically used the Tracking Technologies to track and utilize Plaintiff's and Class members' Private Information for its own financial benefit.

266. Defendant was not acting under color of law to intercept Plaintiff's and Class members' wire or electronic communications.

267. Plaintiff and Class members did not authorize Defendant to acquire the content of their communications for purposes of invading Plaintiff's and Class members' privacy via the Tracking

Technologies.

268.   Any purported consent that Defendant received from Plaintiff and Class members was not valid.

269.   In acquiring and sending the content of Plaintiff's and Class members' communications relating to the browsing of Defendant's Website, creation of accounts, participation in Defendant's health screenings, scheduling appointments, and/or purchasing a subscription plan, Defendant's purpose was tortious and designed to violate federal and state law, including as described above, a knowing intrusion into a private place, conversation, or matter that would be highly offensive to a reasonable person.

### COUNT VII
### VIOLATIONS OF THE CALIFORNIA INVASION OF PRIVACY ACT ("CIPA")
### Cal Penal Code § 631
### (*On behalf of the California Subclass*)

270.   Plaintiff re-alleges and incorporates by reference the allegations above as if fully set forth herein.

271.   CIPA § 631(a) imposes liability for "distinct and mutually independent patterns of conduct." *Tavernetti v. Superior Ct.*, 22 Cal. 3d 187, 192-93 (Cal. 1978). Thus, to establish liability under CIPA § 631(a), a plaintiff need only establish that the defendant, "by means of any machine, instrument, contrivance, or in any other manner," does any of the following:

Intentionally taps, or makes any unauthorized connection, whether physically, electrically, acoustically, inductively or otherwise, with any telegraph or telephone wire, line, cable, or instrument, including the wire, line, cable, or instrument of any internal telephonic communication system,

Or
Willfully and without the consent of all parties to the communication, or in any unauthorized manner, reads or attempts to read or learn the contents or meaning of any message, report, or communication while the same is in transit or passing over any wire, line or cable or is being sent from or received at any place within this state,

Or
Uses, or attempts to use, in any manner, or for any purpose, or to communicate in any way, any information so obtained,

Or
Aids, agrees with, employs, or conspires with any person or persons to unlawfully do, or permit, or cause to be done any of the acts or things mentioned above in this section.

§ 631(a).

272. Section 631(a) is not limited to phone lines, but also applies to "new technologies" such as computers, the Internet, and email. *See Matera v. Google, Inc.*, No. 15-CV-04062-LHK, 2016 WL 8200619, at *21 (N.D. Cal. Aug. 12, 2016) (CIPA applies to "new technologies" and must be construed broadly to effectuate its remedial purpose of protecting privacy); *Bradley v. Google, Inc.*, No. C 06-05289, 2006 WL 3798134, at *5-6 (N.D. Cal. Dec. 22, 2006) (CIPA governs "electronic communications"); *In re Facebook, Inc. Internet Tracking Litigation*, 956 F.3d 589 (9th Cir. 2020) (reversing dismissal of CIPA and common law privacy claims based on Facebook's collection of consumers' Internet browsing history).

273. The Tracking Technologies are a "machine, instrument, contrivance, or … other manner" used to engage in the prohibited conduct at issue here.

274. At all relevant times, by employing the Tracking Technologies, Defendant intentionally tapped, electrically or otherwise, the lines of Internet communication between Plaintiff and Class members on the one hand, and the Website on the other hand.

275. At all relevant times, Defendant aided, agreed with, employed, and conspired with the Information Recipients to use the Tracking Technologies to wiretap consumers to the Website and to accomplish the wrongful conduct at issue here.

276. The wrongful conduct at issue occurred in the State of California, where Defendant maintains its principal place of business.

277. Plaintiff and Class members did not consent to the Information Recipients' intentional access, interception, reading, learning, recording, and collection of Plaintiff's and Class members' electronic communications. Nor did Plaintiff and Class members consent to Defendant aiding, agreeing with, employing, or otherwise enabling the Information Recipients' conduct.

278. The violation of section 631(a) constitutes an invasion of privacy sufficient to confer Article III standing. Unless enjoined, Defendant will continue to commit the illegal acts alleged here. Plaintiff and Class members continue to be at risk because they frequently use the Internet to search for information about products or services. They continue to desire to use the Internet for that purpose,

including for the purpose of researching and acquiring health care services. Plaintiff and Class members also desire to use the Website in the future but have no practical way to know if their Website communications will be monitored or recorded by the Information Recipients.

279. Plaintiff and Class members seek all relief available under Cal. Penal Code § 637.2, including injunctive relief and statutory damages of $5,000 per violation.

## COUNT VIII
### UNLAWFUL USE OF A PEN REGISTER OR TRAP AND TRACE DEVICE
### Cal Penal Code § 638.51

### (*On behalf of Plaintiffs and the Nationwide Class*)

280. Plaintiff re-alleges and incorporates by reference the allegations above as if fully set forth herein.

281. Plaintiff pleads this claim in the alternative to V and VI.

282. California Penal Code § 638.51(a) makes it unlawful for a person to "install or use a pen register or a trap and trace device without first obtaining a court order." A "pen register" is "a device or process that records or decodes dialing, routing, addressing, or signaling information transmitted by an instrument or facility from which a wire or electronic communication is transmitted, but not the contents of a communication." Cal. Penal Code § 638.50(b).

283. A "trap and trace device" is a "a device or process that captures the incoming electronic or other impulses that identify the originating number or other dialing, routing, addressing, or signaling information reasonably likely to identify the source of a wire or electronic communication, but not the contents of a communication." Cal. Penal Code § 638.50(c). In essence, a "pen register" is a "device or process" that records outgoing information, while a "trap and trace device" is a "device or process" that records incoming information. For example, if a user sends an email, a "pen register" might record the email address from which the email was sent, the email address to which the email was sent, and the subject line – because this is the user's outgoing information. On the other hand, if that same user receives an email, a "trap and trace device" might record the email address from which that email was sent, the email address to which it was sent, and the subject line – because this is incoming information that is being sent to that same user.

284.    Defendant uses a pen register device or process and/or a trap and trace device or process on its Website by deploying the Trackers because the Trackers are designed to capture the IP address, User Information and other information such as the phone number, email, routing, addressing and/or other signaling information of website visitors.

285.    Defendant did not obtain consent from Plaintiffs or any of the Class Members before using pen registers or trap and trace devices to locate or identify users of its Website and has thus violated CIPA.

286.    Plaintiffs and Class members seek all relief available under Cal. Penal Code § 637.2, including injunctive relief and statutory damages of $5,000 per violation.

## COUNT IX
### VIOLATION OF THE CALIFORNIA CONFIDENTIALITY OF MEDICAL INFORMATION ACT ("CMIA")
### Cal. Civ. Code § 56, et seq.
### (*On behalf of Plaintiff and the California Subclass*)

287.    Plaintiff re-alleges and incorporate by reference the allegations above as if fully set forth herein.

288.    Defendant is a "provider of health care," as defined in Cal. Civ. Code § 56.06, and is therefore subject to the requirements of the CMIA, Cal. Civ. Code §§ 56.10(a), (d) and (e), 56.36(b), 56.101(a) and (b).

289.    Plaintiff and the Class are "patients," as defined in CMIA, Cal. Civ. Code § 56.05(m) ("'Patient' means any natural person, whether or not still living, who received health care services from a provider of health care and to whom medical information pertains.").

290.    Defendant disclosed "medical information," as defined in CMIA, Cal. Civ. Code § 56.05(j), to unauthorized persons without first obtaining consent, in violation of Cal. Civ. Code § 56.10(a). The disclosure of information to unauthorized individuals via the Tracking Technologies resulted from the intentional actions and negligent acts and omissions of Defendant, including their implementation of the Tracking Technologies and their failure to (1) secure Plaintiff's and Class members' Private Information; (2) comply with industry standard data security practices; (3) implement adequate Website and event monitoring; and (4) implement the systems, policies, and

procedures necessary to prevent unauthorized disclosures resulting from the use of the Tracking Technologies.

291.   Specifically, Defendant's negligence resulted in the release of Private Information pertaining to Plaintiff and Class members to unauthorized persons and the breach of the confidentiality of that information. Defendant's negligent acts and omissions failed to preserve the confidentiality of Plaintiff's and Class members' Private Information in violation of Cal. Civ. Code §§ 56.06 and 56.101(a).

292.   Defendant's systems and protocols did not protect and preserve the integrity of electronic medical information belonging to Plaintiff and the Class, in violation of Cal. Civ. Code § 56.101(b)(1)(A).

293.   Plaintiff and the Class were injured and have suffered damages, as described above, from Defendant's illegal disclosure and negligent release of their medical information in violation of Cal. Civ. Code §§ 56.10 and 56.101, and therefore seek relief under Civ. Code §§ 56.35 and 56.36, including actual damages, nominal statutory damages of $1,000, punitive damages of $3,000, injunctive relief, and attorney fees, expenses, and costs.

## COUNT X
### VIOLATION OF THE CALIFORNIA CONSUMER PRIVACY ACT ("CCPA")
### Cal. Civ. Code §§ 1798.100, et seq.
#### (*On behalf of Plaintiff and the California Subclass*)

294.   Plaintiff re-alleges and incorporate by reference the allegations above as if fully set forth herein.

295.   Cal. Civ. Code § 1798.150(a) creates a private cause of action for violations of the CCPA.  Section 1798.150(a) specifically provides:

Any consumer whose nonencrypted and nonredacted personal information, as defined in subparagraph (A) of paragraph (1) of subdivision (d) of Section 1798.81.5, is subject to an unauthorized access and exfiltration, theft, or disclosure as a result of the business's violation of the duty to implement and maintain reasonable security procedures and practices appropriate to the nature of the information to protect the personal information may institute a civil action for any of the following:

(A) To recover damages in an amount not less than one hundred dollars ($100) and not greater than seven hundred and fifty ($750) per consumer per incident or actual damages, whichever is greater.

(B) Injunctive or declaratory relief.

(C) Any other relief the court deems proper.

296.   Defendant is a "business" under § 1798.140(b) in that it is a corporation organized for profit or financial benefit of its shareholders or other owners, with gross revenue in excess of $25 million.

297.   Plaintiffs and California Class members are covered "consumers" under § 1798.140(i) in that they are natural persons who are California residents.

298.   The Private Information of Plaintiff and the Class constitutes "personal information" under §§ 1798.150(a) and 1798.81.5(d)(1).

299.   Possessors of non-public medical information, such as Defendant, have a duty to keep such medical information completely confidential.

300.   Plaintiff and Class members had reasonable expectations of privacy in the responses and communications entrusted to Defendant through their Website, which included highly sensitive Private Information.

301.   Contrary to its duties as a health care institution with an online presence and its express promises of confidentiality, Defendant installed the Tracking Technologies to disclose and transmit to third parties Plaintiff's and Class members' Private Information, including data relating to Plaintiff's and Class members' health.

302.   As a direct and proximate result of Defendant's acts and omissions, the private and sensitive Private Information, including the IIHI and PHI of Plaintiff and Class members, was disclosed to unauthorized third parties, causing Plaintiff and the Class to suffer damages, including but not limited to the loss of Plaintiff's and Class members' legally protected interest in the confidentiality and privacy of their Private Information, stress, fear, anxiety, and additional losses described above.

303.   Defendant's wrongful conduct will continue to cause great and irreparable injury to Plaintiff and the Class since their Private Information is still maintained by Defendant and still in the possession of the Information Recipients, and the wrongful disclosure of the Private Information cannot be undone.

CLASS ACTION COMPLAINT

304. On February 5, 2026, pursuant to California Civil Code § 1798.150(b), Plaintiff mailed a CCPA notice letter to Defendant, detailing the specific provisions of the CCPA that Defendant has violated and continues to violate. Defendant received this notice letter on February 9, 2026. Defendant has not cured the violations within 30 days, thus Plaintiffs seek statutory damages as permitted by the CCPA in an amount not less than one hundred dollars ($100) and not greater than seven hundred and fifty ($750) per consumer per incident, or actual damages, whichever is greater pursuant to Cal. Civ. Code § 1798.150(a)(1)(A) and (b) as well as actual pecuniary damages suffered as a result of Defendant's violations described herein.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff, on behalf of herself and the proposed Classes, respectfully requests that this Court enter an Order:

a) Certifying this case as a class action on behalf of the Nationwide Class and the California Subclass defined above, appointing Plaintiff as representative of the Classes, and appointing her counsel as Class Counsel;

b) For equitable relief enjoining Defendant from engaging in the wrongful conduct complained of herein pertaining to the misuse and/or unauthorized disclosure of Plaintiff's and Class members' Private Information;

c) For injunctive relief requested by Plaintiff, including but not limited to, injunctive and other equitable relief as is necessary to protect the interests of Plaintiff and Class members;

d) For an award of damages, including but not limited to, actual, consequential, punitive, and nominal damages, as allowed by law in an amount to be determined;

e) For an award of statutory damages;

f) For an award of attorneys' fees and costs, and any other expense, including expert witness fees;

g) Pre- and post-judgment interest on any amounts awarded; and

h) Such other and further relief as this court may deem just and proper.

Dated: March 13, 2026                                    Respectfully submitted,

                                                         */s/  Robert A. Mackey*
                                                         Robert Mackey (SBN 125961)
                                                         bobmackeyesq@aol.com
                                                         **LAW OFFICES OF ROBERT MACKEY**
                                                         660 Baker Street
                                                         Building A, Ste. 201
                                                         Costa Mesa, CA 92626
                                                         Tel: (412) 370-9110

                                                         **MIGLIACCIO & RATHOD, LLP**
                                                         Nicholas A. Migliaccio*
                                                         Jason S. Rathod*
                                                         Bryan G. Faubus*
                                                         Zachary O. Chambers*
                                                         Tel: 202.470.3520
                                                         nmigliaccio@classlawdc.com
                                                         jrathod@classlawdc.com
                                                         bfaubus@classlawdc.com
                                                         zchambers@classlawdc.com
                                                         * *pro hac vice anticipated*

                                                         *Attorneys for Plaintiff & the Putative Class*

CLASS ACTION COMPLAINT